**SEMI–TECH LITIGATION, LLC, Plaintiff,**

v.

**BANKERS TRUST COMPANY, et al., Defendants.**

**No. 02 Civ.0711 LAK.**

United States District Court, S.D. New York.

July 17, 2003.

---

**321**

Robert I. Bodian, Kevin Ainsworth, Mintz Levin Cohn Ferris Glovsky and Popeo P.C., New York City, for Plaintiff.

Edward Flanders, F. Joseph Owens, Jr., Pillsbury Winthrop LLP, New York City, for Defendant Bankers Trust Company.

## MEMORANDUM OPINION

KAPLAN, District Judge.

So far as is relevant here, this is an action against Bankers Trust Company ("BT") by a purported assignee created under a Chapter 11 plan of liquidation of Semi–Tech Corporation ("Semi–Tech") and related debtors for alleged breach of BT's obligations as indenture trustee with respect to certain Semi–Tech notes.[1] The matter is before the Court on BT's motion to dismiss for lack of standing.

### Facts

*The Complaint*

As the scope of this motion is limited, only a brief description of the relevant allegations of the amended complaint is required.

In 1993, Semi–Tech's predecessor in interest[2] purchased from Akai Holdings Limited stock in Singer Sewing Machine Company for $848 million. It raised approximately $654 million for that purpose through the issuance of senior discount notes pursuant to an indenture, dated August 18, 1993, between Semi–Tech and BT.[3] The indenture, as is customary, contained a variety of provisions defining as events of default self dealing and other transactions, including certain issuances of additional debt and the failure to maintain certain financial ratios. BT served as the indenture trustee until May 11, 1999.[4]

The complaint alleges a long series of transactions commencing in late 1995 and continuing into 1999 in which, plaintiff claims, Semi–Tech acted dishonestly and/or imprudently and breached its obligations under the indenture.[5] It charges that BT breached its obligations to the note holders under the indenture and the Trust Indenture Act of 1939 ("TIA"),[6] as well as its fiduciary duties, by failing adequately to protect the note holders and by accepting deficient certificates from Semi–Tech officers and its auditor that purported to affirm compliance with various requirements under the indenture agreement. It seeks to recover damages as assignee of certain of the note holders.

*The Bankruptcy and the Alleged Assignments*

Semi–Tech filed for bankruptcy protection on September 7, 1999. Plaintiff Semi–Tech Litigation LLC, a Delaware limited liability company, was created, and purports to have authority to bring this action, "by virtue of (a) a September 18, 2000

---

1. The Court assumes familiarity with prior substantive rulings in this matter. *Semi–Tech Litig. LLC v. Bankers Trust Co.*, 234 F.Supp.2d 297 (S.D.N.Y.2002); *id*, 2002 WL 31507513 (S.D.N.Y. Nov. 8, 2002).

2. The Court includes the predecessor in interest in subsequent references to Semi–Tech.

3. Am Cpt ¶¶ 24–27.

4. *Id.* ¶ 28.

5. *Id.* ¶¶ 38–78.

6. 15 U.S.C. §§ 78aaa *et seq.*

First Amended Plan of Liquidation of Unsecured Creditors of Semi–Tech Group under Chapter 11 of Bankruptcy Code (the 'Plan') ..., and (b) the Bankruptcy Court's November 9, 2000 Findings of Fact and Conclusions of Law Relating to, and Order Under 11 U.S.C. § 1129(a) and (b) Confirming the Plan...." [7]

The Plan provided for assignment to plaintiff of Creditor Causes of Action [8] by holders of unsecured claims including, among others, those who beneficially owned the relevant notes as of September 15, 2000, i.e., the date for purposes of determining creditors entitled to vote to accept or reject the Plan ("Record Date Note Holders"),[9] and those who no longer owned their notes ("Former Note Holders").

Section 7.5.2 of the Plan provided that, "[i]n addition to soliciting votes to accept or reject the Plan," ballots sent to holders of unsecured claims, such as Record Date Note Holders, were to give them "an option to accept or decline, by so indicating on the Ballots, the Creditor Claim Assignment Offer [the "CCAO"]." [10] This purportedly permitted each Record Date Note Holder to (a) elect to assign its claims against Potential Defendants "as of the Effective Date [March 16, 2001 [11]] to the [plaintiff]," or (b) decline the offer and retain its claims against Potential Defendants.[12] Section 7.5.2, however, went on to provide that "[a]ll [Record Date Note] holders ... shall be deemed to have accepted the Creditor Claim Assignment Offer unless such holders elect to reject [it] on the Ballot ..."

Section 7.5.4 of the Plan provided that past or former creditors of the Debtors, such as Former Note Holders, might assign their claims against Potential Defendants "by executing and delivering the Former Holder Assignment Forms to the Claims Agent." [13] Thus, unlike Record Date Note Holders, Former Note Holders were required affirmatively to assign their claims in order for those claims to be transferred to plaintiff.

*Discussion*

BT maintains that neither a bankruptcy estate nor an entity created by a reorganization or liquidation plan has standing to assert claims of third parties, including claims of holders of notes of the debtor, of misconduct by an indenture trustee, regardless of any assignment by a confirmed plan, a Bankruptcy Court, or the third parties. In any case, it contends that even if plaintiff has standing generally to pursue

7. Am Cpt ¶ 5.

Plaintiff further asserts that "[s]ection 14.1 of the Plan and ¶ 60 of the Confirmation Order give Plaintiff authority to commence this proceeding." *Id.* They do not do so.

8. These are defined as "all Causes of Action of creditors (including, but not limited to, Causes of Action against the Potential Defendants) relating to or arising from any of the following: (a) the Claims held by the Electing Holders, (b) the Claims held by the Electing Former Holders, (c) the Debtors, (d) transactions involving any of the Debtors or their assets, property or business and Insiders or Affiliates of the Debtors as of and/or prior to the Petition Date, (e) any sales by the Debtors of Akai Shares, (f) the A/O Concern Podolsk Transaction, and (g) causes of action by the

Indenture Trustee relating to the Debtors." BT Ex. C § 1.36, at 5.

9. *See* BT Ex. E ¶ 9, at 4.

10. *Id.* Ex. C, at 24.

11. The "Effective Date" is defined as the "first Business Day on which (a) all conditions precedent set forth in Section 11.2 of the plan have been satisfied or waived as provided in Section 11.3 hereof and (b) no stay of the Confirmation Order is in effect." *Id.* Ex. C § 1.57, at 7. The Effective Date was March 16, 2001. *Id.* Ex. F, ¶ 2.

12. *Id.* Ex. C, at 24.

13. *Id.* at 25.

such claims, it cannot assert the TIA claims because it did not obtain assignments from those who owned the notes at the relevant time. Finally, it maintains that the assignments violated the New York champerty statute [14] and therefore are void.

Plaintiff contends that it properly sues as assignee on two theories: viz. that (1) the claims of the Record Date Note Holders were assigned by virtue of the Bankruptcy Court's order confirming the Plan, and BT is foreclosed by *res judicata* and collateral estoppel from challenging that assignment, and in any case (2) holders of approximately 72 percent of the notes as of the record date accepted the CCAO and some Former Note Holders executed assignments in favor of plaintiff.[15]

### A. Plaintiff's Standing to Assert Claims on Behalf of Note Holders Generally

In *Caplin v. Marine Midland Grace Trust Co.,*[16] the Supreme Court held that a reorganization trustee created under the former bankruptcy act lacked standing to assert claims against an indenture trustee on behalf of holders of the debtor's debentures. It reasoned that the bankruptcy statute did not suggest "that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of debenture holders," [17] that debenture holders should make their own assessments of the advantages and disadvantages of litigation,[18] and that such suits by a trustee would create a risk of results inconsistent with those in any actions brought by individual debenture holders.[19] In revising the statute, moreover, Congress considered but ultimately rejected legislation that would have overturned this holding.[20]

*Caplin* is distinguishable from this case in that the debenture holders there, in contrast to the situation here, had not assigned their claims to the trustee. In *Williams v. California 1st Bank,*[21] however, the Ninth Circuit held that this difference was immaterial and that a bankruptcy trustee who had obtained assignments by investors nevertheless lacked standing to sue on the assigned claims. It reached this result in light of its conclusion that the trustee "had no claim of its own" and, as in *Caplin,* the investors remained the real parties in interest, and there otherwise would have been a risk of inconsistent results in any actions brought by non-assigning investors.[22] BT therefore argues that plaintiff lacks standing to sue on behalf of the note holders irrespective of whether it obtained valid assignments of note holders' claims against it.

■ With respect, this Court does not find *Williams* persuasive. *Caplin* involved an effort to discern whether Congress intended trustees to exercise such a power whereas the issue both in *Williams* and here is whether assignments should be stripped of legal effect because the assignee is a creature of a bankruptcy. The considerations that moved the Supreme Court in *Caplin* are considerably less com-

---

14. N.Y. JUD. L. § 489 (McKinney 1983).

15. Pl. Mem. 17; *see also* Ainsworth Decl. ¶ 9 & Ex. G.

16. 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

17. *Id.* at 428, 92 S.Ct. 1678.

18. *Id.* at 431, 92 S.Ct. 1678.

19. *Id.* at 431–32, 92 S.Ct. 1678.

20. *See In re Ozark Rest. Equip. Co.,* 816 F.2d 1222, 1227–28 (8th Cir.1987).

Although decided under a prior statute, *Caplin* remains applicable under the present Bankruptcy Code. *See, e.g., In re Mediators,* 105 F.3d 822, 825–26 (2d Cir.1997).

21. 859 F.2d 664 (9th Cir.1988).

22. *Id.* at 666–67.

pelling in this context. If there is a substantial argument here that the plaintiff-assignee is not the real party in interest, it may be advanced under FED. R. CIV. P. 12(b)(6) and 17. The fact that the plaintiff-assignee has no claim of its own is no different than in most cases, outside the bankruptcy context, in which assignees may sue on assigned claims. Likewise, there always is a risk, outside the bankruptcy context, that a non-assigning note or debenture holder may sue and obtain results inconsistent with a result obtained by an assignee of an identical claim, but that affords no basis for refusing to allow suit on assigned claims. The Court sees no basis for treating an assignee created by, or assignments made pursuant to, a Chapter 11 plan any differently.

## B. The Validity of the Assignments

The next aspect of BT's standing argument is a collateral attack on the power of the Bankruptcy Court to effect an assignment of the claims by approving the Plan.

A collateral attack may be foreclosed by principles of former adjudication provided the party mounting the challenge was subject to the personal jurisdiction of the Bankruptcy Court and, despite notice of and an opportunity to challenge the Confirmation Order, failed to appeal from it.[23] As the proponent of the Plan was obliged to give notice to BT, which does not deny its receipt, and as BT failed to appeal from

the Confirmation Order,[24] the Court proceeds to the merits of the former adjudication argument.

### 1. Collateral Estoppel

The collateral estoppel argument is readily disposed of.

■ As a general proposition, "[t]he normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts."[25] The governing principle is clear:

"Litigants who have had a full and fair opportunity to litigate ordinarily will not be heard to relitigate an issue actually, finally and necessarily decided against them in a prior action." In order for this doctrine of issue preclusion to apply, four requirements must be satisfied:

"'(1) the issues in both proceedings must be identical (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a final judgment on the merits.'"[26]

■ So far as this record discloses, the question whether the Bankruptcy Judge had the power to transfer the claims of the Record Date Note Holders to the plaintiff[27] was not actually litigated in the

---

**23.** *See Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 89 (2d Cir.1997). *See also* 11 U.S.C. § 1141(a) ("provisions of ... confirmed plan bind the debtor, any entity issuing securities under the plan, and any creditor, equity security holder, or general partner in the debtor ...").

**24.** An indenture trustee is a party in interest under the Code. 11 U.S.C. § 1109. BT was entitled to notice of the proposed confirmation both as a party in interest and as an indenture trustee and to an opportunity to object. 11 U.S.C. § 1128(b); BANKR. R.2002(b). It was a creditor as well, Ains-

worth Decl. Ex. E, and entitled to notice and an opportunity to object in that capacity also.

**25.** *Turshen v. Chapman*, 823 F.2d 836, 839 (4th·Cir.1987).

**26.** *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 239 (S.D.N.Y.1997) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987)).

**27.** The Court treats the Plan provision deeming those Record Date Note Holders who

Bankruptcy Court. In consequence, collateral estoppel does not foreclose BT's attack on the assignment made by operation of the Confirmation Order.

## 2. Res Judicata

■ In order to prevail on a *res judicata* contention, the proponent must establish that (1) the prior action upon which it relies was finally adjudicated on the merits, (2) it involved the same parties or their privies, (3) the court was of competent jurisdiction, and (4) the causes of action were the same in both cases.[28] Among the indicia relevant to determining whether the cause of action in the bankruptcy was the same as that here is "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan."[29]

■ "The confirmation of a plan in a Chapter 11 proceeding is an event comparable for *res judicata* purposes to the entry of a final judgment in an ordinary civil litigation."[30] No one suggests that the confirmation of the plan of liquidation at issue here stands differently, so the requirement of a final judgment on the merits is satisfied. BT was a party to the bankruptcy. In light of the Second Circuit's decision in *Corbett*, it cannot seriously be asserted that the Bankruptcy Court was not a forum of competent jurisdiction in the sense required for this purpose.[31]

In consequence, the *res judicata* argument comes down to the question whether the cause of action in the bankruptcy case was the same as that now asserted here.

■ Outside the bankruptcy context, the scope of a cause of action for *res judicata* purposes is a function of "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."[32] The same criteria are relevant here.[33]

■ The Bankruptcy Court necessarily had before it in determining whether to approve the Plan the question whether it had authority to work an assignment of the claims of the Record Date Note Holders to the plaintiff. Precisely the same facts and circumstances relied upon here in BT's challenge to the assignment were pertinent in the Bankruptcy Court. Accordingly, the usual requirements for application of *res judicata* are satisfied.

BT contends that plaintiff has pointed to no case that is precisely analogous to this one. It points out that *Corbett* held that the trustees of a pension plan were precluded by a confirmation order from challenging the release of their withdrawal liability claim, which had been the subject of a proof of claim filed by the pension fund.[34] Its implied point thus is that the confirmation order at issue in *Corbett* di-

failed to reject the CCAO in timely ballots with respect to plan confirmation as having accepting it, BT Ex. C, § 7.5.2, as the substantial equivalent of an order assigning their claims.

28. *E.g., Corbett*, 124 F.3d at 87–88.

29. *Id.* at 88 (quoting *Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 875–76 (2d Cir.1991)).

30. *In re Am. Preferred Prescrip., Inc.*, 255 F.3d 87, 92 (2d Cir.2001).

31. *See Corbett*, 124 F.3d at 89.

32. *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir.), *cert. denied*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000) (quoting *NLRB v. United Technologies Corp.*, 706 F.2d 1254, 1260 (2d Cir.1983) (internal quotation marks omitted)). *See also* RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982).

33. *Corbett*, 124 F.3d at 89.

34. *Id.*, 124 F.3d 82.

rectly determined a claim for relief that had been interposed in the bankruptcy, whereas the order here did no such thing. True enough. But *In re American Preferred* reached a similar result with respect to a creditor's challenge to a post-confirmation order which merely appointed a trustee. That case therefore suggests that the applicability of *res judicata* is not necessarily dependent upon the confirmation order disposing of a claim for relief that the party mounting the collateral attack actually, or might have, interposed in the bankruptcy. Moreover, the case is especially instructive here, as it held that the collateral attack was precluded only after weighing "the considerations that favor and oppose preclusion for the type of order" there at issue, which included the impact on the effectiveness of the plan of allowing such attacks.[35]

In *In re American Preferred*, the Circuit wrote:

"Favoring preclusion is the risk to the orderly consummation of the plan that would be created by permitting the trustee's authority to be challenged long after his appointment. The order giving the Trustee full trustee powers is unquestionably a significant order. Armed with such powers, the Trustee can take a broad range of actions and has a legal status entitling him to request Bankruptcy Court approval for many other actions. If a challenge to the Trustee's authority can be made long after his appointment, the validity of these actions will be placed in doubt. Then, if it is ultimately determined that the Trustee was invalidly appointed, the courts will have to determine whether to undo all of the Trustee's actions, or only those where substantial rights would not be prejudiced by undoing the Trustee's actions, or only the action challenged by the party attempting to appeal the

Trustee's appointment. Cf. *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir.1996) (in banc) (considering, under rubric of 'equitable mootness,' whether substantial consummation of plan justified dismissal of appeal); *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993) (same); cf. also *Cajun Electric Power*, 69 F.3d at 748 (speculating that relief for improper pre-confirmation appointment of trustee would be to vacate reorganization plan). The resulting uncertainties would risk serious interference with the orderly and expeditious consummation of a confirmed plan of reorganization.

"Opposing preclusion is the risk of precipitating extra appeals. If some post-confirmation orders are given preclusive effect against parties who could have but did not appeal them, even though the orders had no immediate effect on the rights of such parties, some parties will feel obliged to appeal some orders only to protect their position in the event that the order is subsequently applied to affect their rights. Judge Easterbrook has expressed this concern in counseling against according preclusive effect to unappealed interim orders that are appealable by virtue of 28 U.S.C. § 158(d). See Reichman v. United States Fire Insurance Co. (*In re Kilgus*), 811 F.2d 1112, 1116 (7th Cir.1987). In Judge Easterbrook [*sic*] view, 'the failure to appeal an order in a bankruptcy case must forfeit later review only when the order would have been final under the more stringent standards of 28 U.S.C. § 1291.' *Id.* Even if we were to accept that view, a post-confirmation order appointing a trustee is not an interim order, and, as the equivalent of a substantive post-judgment order, would

**35.** 255 F.3d at 93–94.

have been appealable under ordinary civil litigation standards.

"Weighing these competing considerations involves predictions about the future, as to which judges have no special competence. Nevertheless, a choice must be made, and we regard the risks of extra appeals in the post-confirmation context to be minimal and of far less concern than the uncertainties that would be created by permitting long-delayed challenges to significant post-confirmation orders. Most post-confirmation orders that have no immediate effect on a party sufficient to precipitate an immediate appeal are unlikely ever to have such an effect, and it seems unlikely that unaffected parties will bother with protective appeals. On the other hand, the rare post-confirmation order that has a significant potential for affecting the rights of parties should be challenged promptly (if at all) in order to avoid disruption of the plan's consummation. An unappealed post-confirmation order appointing a trustee should have preclusive effect, just as an unappealed order confirming a plan, see Multnomah County v. Ivory (*In re Ivory*), 70 F.3d 73, 75 (9th Cir.1995) (bankruptcy court's confirmation of plan is final order that if not appealed, cannot be attacked a few months later in same bankruptcy proceeding, even for lack of subject matter jurisdiction); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir.1987) (same). The 'finality interests' of res judicata 'are particularly important in the bankruptcy context, where numerous contending claims and interests are gathered, jostle, and are determined and released.' *Corbett*, 124 F.3d at 91." [36]

Very much the same considerations apply here. The order deeming the claims of the Record Date Note Holders assigned to the plaintiff was "unquestionably a significant order." [37] Those who stood to benefit from any recovery plaintiff might obtain may well have been influenced in their actions with respect to Plan approval by the proposed order. If the order ultimately were undone, serious questions might be raised as to what if anything should be done in respect of the Plan. Thus, permitting a collateral attack would create a "risk to the orderly consummation of the plan." [38]

On the other hand, a rule of preclusion effectively would force parties in positions analogous to that of BT to appeal from confirmation orders vesting powers or rights in entities such as the plaintiff in order to protect themselves against the possibility that the failure to do so would prevent later challenges in the event they ultimately were sued. In consequence, there is a risk that a rule of preclusion would stimulate appeals that otherwise would not be brought on issues that, as a practical matter, ultimately may prove to be entirely academic.

In the last analysis, this Court believes that the balance struck in *In re American Preferred* applies here as well. Insofar as the Confirmation Order transferred the claims of the Record Date Note Holders to the plaintiff, it had "a significant potential for affecting the rights of parties." It should have been "challenged promptly (if at all) in order to avoid disruption of the plan's consummation." [39] Accordingly, the Court holds that BT's challenge to the assignment of the Record Date Note Holders' claims to the plaintiff is barred by the Confirmation Order under the doctrine of *res judicata.*

**36.** 255 F.3d at 93–94.

**37.** *Id.* at 93.

**38.** *Id.*

**39.** *Id.* at 94.

## C. Did the Record Date Note Holders Have Anything to Assign?

BT mounts an alternative argument, i.e., that the Record Date Note Holders [40] had no claims to assign and that the plaintiff therefore took nothing by the assignments. Consideration of this contention begins with the allegations of the amended complaint that relate to BT.

### 1. TIA Claims

The claims against BT rest on the assertions that it failed to (i) examine documents submitted to it by Semi–Tech and its auditor and the resulting failure to detect Semi–Tech's alleged defaults, and (ii) notify the note holders of those defaults.[41] The earliest of the allegedly deficient certificates was submitted on or about August 14, 1997 and the latest on or about November 26, 1998.[42] BT resigned as indenture trustee on May 11, 1999. Any claims that any note holders may have had against BT therefore necessarily were based on behavior that was completed long before September 15, 2000, the date as of which the identities of the Record Date Note Holders whose claims were assigned to the plaintiff was determined. In consequence, there is no assurance that Record Date Note Holders owned the notes they held on that date at the times when BT's alleged breaches occurred.[43]

■ The claimed significance of the fact that the notes held by Record Date Note Holders may have been, and in at least a substantial number of cases were, acquired by them after any breach of duty by BT stems from *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey* [44] and like cases, which stand for the proposition that "federal securities law claims are not automatically assigned to a subsequent purchaser upon the sale of the underlying security." [45] Thus, insofar as the Record Date Note Holders acquired the notes they assigned after the TIA claims of their predecessors in interest accrued, they did not acquire any such claims by virtue of their acquisition of the notes. Since an assignor can convey nothing more than the assignor has in the first place, BT contends that the plaintiff received nothing in respect of such claims by means of the assignment.

The next question then is when any TIA claims came into existence. BT contends that this cannot have occurred after the effective date of its resignation because the claims arose "at the time of alleged breaches of the TIA." [46] Plaintiff asserts that they arose on the date on which Semi–Tech filed for bankruptcy protection, as that was the date on which it defaulted on a payment obligation.[47] Plaintiff's reasoning is wrong, and it is far from clear that BT is correct.

The parties advance competing views of *Cruden v. Bank of New York.* [48] But the Court of Appeals there made two points

---

**40.** The logic of the argument may be applicable as well to at least some of the Former Note Holders, although no effort has been made to relate it to the specific Former Note Holders who, plaintiff claims, have executed assignments.

**41.** Am Cpt ¶¶ 139–160.

**42.** *Id.* ¶¶ 79–112.

**43.** Indeed, the record shows that three Record Date Note Holders—Credit Suisse First Boston, Varde and Enterprise—purchased

more than $284.6 million in principal amount, which is more than 43 percent, of the notes after May 11, 1999. Def. Mem. 16–17 (citing record).

**44.** 85 F.3d 970 (2d Cir.1996).

**45.** *Id.* at 974.

**46.** BT Reply Mem. 6.

**47.** Pl. Mem. 20.

**48.** 957 F.2d 961 (2d Cir.1992).

that are beyond dispute and of considerable significance.

■ First, the *Cruden* panel held that, "[b]ecause the claims against the Trustees are not for non-payment of principal or interest as such, but rather assert breaches of the [TIA] and the Indentures," the indenture provision giving debt holders the absolute and unconditional right to sue for payment defaults "is irrelevant in assessing when plaintiffs' causes of action against the Trustees accrued."[49] Plaintiff's assertion that the accrual of the claim against BT occurred at the time of the payment default therefore is incorrect.

Second, the *Cruden* panel held also that the claims against the trustees could not "be deemed to have *accrued* until the plaintiffs were entitled to a remedy, regardless of when the Trustees actually breached the Indentures."[50] Here, the note holders certainly cannot have been entitled to a remedy any earlier than the date or dates on which they first suffered injury by virtue of the alleged violations of

the Act.[51] Yet the amended complaint, although it alleges injury to the note holders,[52] is largely silent as to when that injury allegedly occurred. It alleges in essence that BT failed to blow the whistle on alleged misconduct by Semi–Tech, which implies that injury was sustained when the facts later came to light. But it is far from clear when that allegedly occurred. Thus, it is impossible to tell on the present record when the TIA claims accrued.

■ Challenges to subject matter jurisdiction that depend upon facts intertwined with the merits, as does this one, are assessed by the standards that govern summary judgment motions.[53] Thus, it is BT's burden to show that there is no genuine issue as to any material fact. But the record here permits no conclusion regarding the extent to which, if at all, the notes owned by the Record Date Note Holders on the effective date of the assignment were owned by them at the time or times at which the TIA claims accrued.[54]

---

**49.** *Id.* at 968.

**50.** *Id.* (emphasis in original).

**51.** The "no action" clause in the indenture would not have foreclosed suit against the trustee even if its conditions had not been satisfied. *Id.* ("it would be absurd to require the debenture holders to ask the Trustee to sue itself").

**52.** Am Cpt ¶¶ 153, 160.

**53.** *E.g., First Capital Asset Mgt., Inc. v. Brickellbush, Inc.,* 218 F.Supp.2d 369, 378 (S.D.N.Y.2002); *Dar El–Bina Eng'g & Contracting Co. v. Republic of Iraq,* 79 F.Supp.2d 374, 385 (S.D.N.Y.2000) (quoting *London v. Polishook,* 189 F.3d 196, 198 (2d Cir.1999), in turn quoting *Careau Group v. United Farm Workers of Am., AFL–CIO,* 940 F.2d 1291, 1293 (9th Cir.1991)); *see also Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) ("While a 12(b)(1) motion cannot be converted into a Rule 56 motion, Rule 56 is relevant to the jurisdictional challenge in that the body of decisions under Rule 56 offers

guidelines in considering evidence submitted outside the pleadings.").

**54.** Amidst motion papers standing over nine inches thick, there are some records that appear to detail transactions of some of the note holders in the notes in question. With one minor exception, neither side has made any effort to analyze any of the trading information. It is not the Court's obligation to attempt to make sense out of this undifferentiated, largely unexplained, mass of information which, in any case, the parties acknowledge is incomplete.

The Court has considered also the fact that a non-moving party may lose a motion for summary judgment by failing to come forward with admissible evidence sufficient to get to the jury on an issue as to which it will bear the burden of proof at trial where the moving party places in issue its ability to do so. *E.g., Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when non-moving party bears burden of proof at trial, moving party is entitled to summary

### 2. State Law Claims

BT argues also that the amended complaint does not assert any state law claims against it and, in any case, that plaintiff has failed to show that any such claims were assigned to it, essentially on the theory outlined with respect to the TIA claims. The first of these arguments is so lacking in merit as to require no discussion, and the second cannot be resolved on the present record.

Section 13–107 of the New York General Obligations Law provides in substance that the transfer of a note, absent a written agreement to the contrary, conveys also the transferor's claims for damages against the indenture trustee.[55] Thus, to the extent that this statute applied to transfers of notes prior to the record date, transferees succeeded to any state law claims that previously may have accrued in favor of their transferors. The key question, however, is the extent of the statute's application.

 Plaintiff asserts that the statute applied to all transfers of notes because the indenture contains a New York governing law clause.[56] The governing law clause in the indenture, however, has "no relevance to the question whether the contracts of sale [of notes] ... operated to assign certain rights of action." [57] This question is controlled, as to each sale, by New York choice of law principles. As the parties have not identified who held the notes at the times state law claims accrued, much less their successors in interest, and as the facts pertinent to determining the law governing the effect of transfers are not before the Court, it is impossible to say on this record whether and to what extent the New York statute or other applicable law resulted in the acquisition by assignee note holders of state law claims of their predecessors in interest.

### D. Champerty

BT next argues that plaintiff's taking of the assignments violated the New York champerty statute [58] and that it consequently may not sue on the assigned claims. Plaintiff counters that it did not violate the statute both because it did not take the assignments with the requisite intent and because the statute excepts assignments taken in this context. It contends also that the Bankruptcy Code oth-

---

judgment if non-movant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Sadler v. Moran Towing Corp.*, 204 F.Supp.2d 695, 696 n. 7 (S.D.N.Y.2002); *Clark v. Meyer*, 188 F.Supp.2d 416, 423–24 & n. 39 (S.D.N.Y.2002); *Frank v. Plaza Constr. Corp.*, 186 F.Supp.2d 420, 434–35 n. 75 (S.D.N.Y.2002); *Diamond Direct, LLC v. Star Diamond Group, Inc.*, 116 F.Supp.2d 525, 531 n. 38 (S.D.N.Y.2000). Given the parties' approaches to this issue, the Court does not regard plaintiff's ability to demonstrate that the notes held by the Record Date Note Holders on the record date were held by them at the time the TIA claims accrued as properly having been placed in issue. Application of this principle therefore would be inappropriate, at least on the present record.

**55.** N.Y. GEN. OBLIG. L. § 13–107 (McKinney 2001).

**56.** Pl. Mem. 19.

Actually, plaintiff's unsworn memorandum asserts that the notes also contained such a clause. *Id.* No such evidence, however, has been submitted.

**57.** *In re Nucorp Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir.1985).

**58.** N.Y. JUD. L. § 489.

erwise would trump the statute under the Supremacy Clause and, in any case, that plaintiff has waived the defense.

■ Section 489 of the Judiciary Law provides in relevant part that it is a misdemeanor for any:

"person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and [any] corporation or association, directly or indirectly, ... [to] solicit, buy or take an assignment of ... a bond, promissory note ... or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon ..., provided, however, that ... things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise." [59]

The statute is violated if "the foundational intent to sue on th[e] claim [was] at least ... the primary purpose ..., if not the sole motivation behind, entering into the transaction" [60] unless the saving proviso is satisfied. Moreover, an assignment made in violation of the statute is void and may not be sued upon.[61]

Plaintiff here contends that the primary purpose of its formation was to facilitate

implementation of the Plan and that the primary purpose of the assignments was to liquidate the debtors' estates. Moreover, it argues, the assignments were not solely for the purpose of bringing suit, but also to investigate, settle, adjust, enforce, retain, abandon and/or liquidate the Assigned Causes of Action.[62]

■ The purpose of plaintiff's formation is relevant only to the extent that it bears on plaintiff's purpose in taking the assignments. Moreover, there is strong evidence that the sole or primary purpose was to sue on the assigned claims.[63] Nevertheless, the New York Court of Appeals has emphasized that "it has been hesitant to find that an action *is champertous as a matter of law.*" [64] Where, as here, any basis is advanced that might justify a trier in finding that the sole or primary purpose was not the commencement of a lawsuit, summary judgment must be denied.[65] In consequence, the action cannot now be dismissed under Section 489. This conclusion makes it unnecessary to consider plaintiff's other contentions at this time.

### Conclusion

The motion of Bankers Trust Company to dismiss the complaint is denied.

SO ORDERED.

---

**59.** *Id.*

**60.** *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.,* 94 N.Y.2d 726, 736, 709 N.Y.S.2d 865, 871, 731 N.E.2d 581 (2000) (emphasis in original).

**61.** *E.g., Elliott Associates, L.P. v. Republic of Panama,* 975 F.Supp. 332, 339 (S.D.N.Y. 1997); *Koro Co. v. Bristol–Myers Co.,* 568 F.Supp. 280, 288 (D.D.C.1983); *Frank H. Zindle, Inc. v. Friedman's Express,* 258 A.D. 636, 17 N.Y.S.2d 594 (1st Dep't 1940).

**62.** Pl. Mem. 23–24.

**63.** *See, e.g.,* BT Ex. Y, § 1.5, at 2.

**64.** *Bluebird Partners, L.P.,* 94 N.Y.2d at 734, 709 N.Y.S.2d at 870, 731 N.E.2d 581 (emphasis in original).

**65.** *See id.,* 94 N.Y.2d at 738–39, 709 N.Y.S.2d at 872–73, 731 N.E.2d 581.