PER CURIAM:
This appeal involves, among other issues, the duty of an indenture trustee, acting under the Trust Indenture Act of 1939 (“TIA”), 15 U.S.C. § 77aaa et seq., to give notice to noteholders of events of default, and the circumstances under which an indenture trustee may be excused from the obligation. Under an indenture (the “Indenture”) it made with Semi-Tech Corporation (“Semi-Tech”), defendant Bankers Trust Company (“BT”) served as indenture trustee for Semi-Tech’s Senior Secured Discount Notes (the “Notes”). After Semi-Tech’s bankruptcy, holders of the Notes (the “Noteholders”) assigned their legal claims to plaintiff, which brought this action against BT alleging breach of statutory duties under the TIA, breach of contractual duties under the Indenture, and breach of fiduciary duties under New York law.[1]
*123 On defendant’s motion for summary-judgment, the United States District Court for the Southern District of New York (Lewis A. Kaplan, /.) held that BT had breached its duty to the Noteholders to inspect certain certificates provided to it by Semi-Tech under the Indenture, but that plaintiff was entitled to only nominal damages of $1. Plaintiff and defendant each appeal from the court’s judgment. We affirm, and adopt the opinions of the district court, Semi-Tech Litigation, LLC v. Bankers Trust Co., 353 F.Supp.2d 460 (S.D.N.Y.2005), and Semi-Tech Litigation, LLC v. Bankers Trust Co., 272 F.Supp.2d 319 (S.D.N.Y.2003), as the law of this Circuit, with one exception we discuss below. We agree with the district court that: (1) Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), does not deprive plaintiff of standing to assert the claims of the Noteholders, see 272 F.Supp.2d at 323-24; (2) plaintiffs taking of the assignments from the Noteholders was not a violation of the New York champerty statute, N.Y. Jud. L. § 489, see id. at 330-31; (3) BT failed to fulfill its duty pursuant to Section 315(a) of the TIA to examine for conformity with the Indenture the officers’ and accountants’ certificates it received from Semi-Tech pursuant to Section 314 of the TIA, see 353 F.Supp.2d at 472-79; but (4) the violation resulted in only nominal damages because, as a matter of law, plaintiff did not establish that these violations caused any monetary damages suffered by the Noteholders, see id. at 482-87; and (5) BT did not violate any prudent-person duties, see id. at 480-82.
Background
We include here only so much of the background as is necessary to explain our one point of disagreement with the district court; a comprehensive discussion of the facts, statutes, and contractual terms at issue can be found in Judge Kaplan’s excellent opinions. See 353 F.Supp.2d at 462-69;, 272 F.Supp.2d at 321-22.
The Notes were issued in August 1993. Through the sale of the Notes under the Indenture, Semi-Tech raised $300 million, which it used to purchase 51% of the shares of The Singer Company, N.V. (“Singer”). Semi-Tech pledged the Singer shares as security for the payment of the Notes on their maturity in 2003. Because of the bankruptcy of both Singer and Semi-Tech in 1999, the Notes were not paid in accordance with their terms.
The complaint charges BT with various derelictions of its duties to protect the Noteholders. This opinion concerns BT’s obligations, arising from Semi-Tech’s failure to comply with its obligation under the Indenture to render periodic certifications in mandatorily specified language as to whether Semi-Tech’s officers and accountants had knowledge of default in the performance of its obligations under the Indenture. The complaint alleges that throughout the period from 1995 to 1999, Semi-Tech engaged in transactions with affiliates, disposed of certain assets, and incurred debt in a manner that violated its undertakings under the Indenture and eventually resulted in its bankruptcy and the Noteholders’ losses. Certificates of compliance delivered by Semi-Tech’s officers and accountants in this period asserted — falsely, according to the complaint— that Semi-Tech was not in violation of its obligations. These certificates failed to set forth representations required by the Indenture, generally to the effect that the *124 certifying persons had read Semi-Tech’s covenants specified in the Indenture, and had made the examinations and investigations necessary to determine whether Semi-Tech was in compliance, briefly describing such examinations and investigations. With the exception of a letter to Semi-Tech dated September 18, 1998, in which BT pointed out that the August 1998 accountant’s certificate did not contain the statements required by § 1017(d) of the Indenture, BT made no other attempts to require that Semi-Tech’s certificates include the conforming language. BT never gave notice to the Noteholders that Semi-Tech’s certificates were not in compliance with the requirements of the Indenture relating to those recitations. 353 F.Supp.2d at 467-68.
The complaint alleges that BT breached its obligations in two respects relevant to this opinion. First, to the extent BT failed to notice the repeated failure of Semi-Tech’s certificates to use the required language, BT allegedly breached its duty under § 315(a) of the TIA “to examine the evidence [i.e., the certificates] furnished to it [by Semi-Tech] pursuant to section 314 to determine whether or not such evidence [the language of the certificates] conforms to the requirements of the indenture.” See 15 U.S.C. § 77ooo(a). Second, by failing to give notice to the Noteholders of the failure of Semi-Tech’s certificates to employ the required language, BT allegedly failed in its obligation under § 315(b) of the TIA to “give to the indenture security holders ... notice of all defaults known to the trustee, within ninety days after the occurrence thereof.” See 15 U.S.C. § 77ooo(b).
a. Governing Provisions
We set forth in greater detail below the provisions of the Indenture and the governing statutes which are relevant to BT’s duties and to aspects of the district court’s ruling.
1. Events of Default by Semi-Tech
Indenture § 502 provides that if an Event of Default “occurs and is continuing,” the issue price of the Notes and accrued interest will be due immediately upon notice to Semi-Tech by BT or the holders of a percentage of the Notes. Indenture § 501 describes the various conditions which give rise to an Event of Default. Under § 501(6), an Event of Default occurs when Semi-Tech fails “to comply for 30 days after notice” with specified sections of the Indenture that limit the ability of Semi-Tech and Singer to take on additional debt, dispose of certain assets, and engage in transactions with affiliates. The catch-all provision of § 501(10) provides that, other than in those circumstances singled out in § 501, an Event of Default occurs when there is a “default in the performance, or breach, of any covenant or warranty of [Semi-Tech] in this Indenture” and the default or breach continues for 60 days after Semi-Tech has received a notice of default from BT or the holders of a percentage of the Notes.
2. Evidence of Compliance Required To Be Furnished by Semi-Tech to BT
Section 314 of the TIA, 15 U.S.C. § 77nnn, referenced in Section 315(a) above, states in relevant part:
Each ... obligor upon the indenture securities ... shall ... (4) furnish to the indenture trustee, not less often than annually, a brief certificate from the principal executive officer, principal financial officer or principal accounting officer as to his or her knowledge of *125 such obligor’s compliance with all conditions and covenants under the indenture.
TIA § 314(a)(4).[2]
Indenture § 1017(a) implements the obligation in TIA § 314(a) by obligating Semi-Tech to deliver annually to BT an officers’ certificate stating that it is in compliance with the provisions of the Indenture:
The Company will deliver to the Trustee, within 140 days after the end of each fiscal year of the Company ending after the date hereof an Officers’ Certificate, stating whether or not to the best knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of [certain covenants in the Indenture, including those restricting debt and transactions with affiliates], and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.
JA 838. Indenture § 1017(b) requires that Semi-Tech deliver quarterly officers’ certificates to the same effect. Indenture § 1017(d) further requires Semi-Tech to provide annual certificates from its accountant that the accountant has reviewed the terms of the Indenture and Notes as they relate to accounting matters, and stating whether in the course of its audit any event has come to the accountant’s attention that is an Event of Default, or would become an Event of Default with notice, the passage of time, or both.
Indenture § 102 elaborates on the language to be used in such compliance certificates, specifying certain statements which must be included in “[e]very certificate or opinion with respect to compliance with a condition or covenant provided for in this indenture.” These include, for example, assertions that the certifying person has “read [the] covenant or condition and the definitions herein relating thereto” and “has made such examination ... as is necessary to enable [the certifying individual] to express an informed opinion as to whether such covenant or condition has been complied with.”[3]
3. Duties of the Trustee Toward the Noteholders
The duties of BT here pertinent are primarily its duty under TIA § 315(a) to inspect the evidence of compliance provided to it by Semi-Tech and its qualified duty under TIA § 315(b) to give the Note- *126 holders notice of defaults of the issuer that are known to the trustee.
Indenture § 601 states that “[t]he duties and responsibilities of the Trustee shall be as provided by the Trust Indenture Act,” and Section 602 likewise provides that “[t]he Trustee shall give the Holders [of the Notes] notice of any default hereunder as and to the extent provided by the Trust Indenture Act.” Section 315 of the TIA imposes several duties on indenture trustees such as BT, and provides in relevant part:
(a) Duties prior to default
The indenture to be qualified shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to provide that, prior to default (as such term is defined in such indenture)—
(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and
(2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture;

but the indenture trustee shall examine the evidence furnished to it pursuant to section 77nnn of this title [TIA § 311] to determine whether or not such evidence conforms to the requirements of the indenture.

(b) Notice of defaults
The indenture trustee shall give to the indenture security holders ... notice of all defaults known to the trustee, within ninety days after the occurrence thereof: Provided, That such indenture shall automatically be deemed (unless it is expressly provided therein that such provision is excluded) to provide that, except in the case of default in the payment of the principal of or interest on any indenture security, ... the trustee shall be protected in withholding such notice [of default] if and so long as the board of directors, the executive committee, or a trust committee of directors and/or responsible officers, of the trustee in good faith determine that the withholding of such notice is in the interests of the indenture security holders.
15 U.S.C. § 77ooo (emphasis added).
b. District Court Rulings
On BT’s motion for summary judgment, the district court held for reasons we discuss below that BT had not violated its duty to give notice of default to the Note-holders under TIA § 315(b). The court did conclude that BT had violated its duty under TIA § 315(a) “to examine the evidence furnished to it pursuant to section 314 to determine whether or not such evidence conforms to the requirements of the indenture.” 353 F.Supp.2d at 472-82. However, it determined that plaintiff had failed to adduce evidence that this breach of BT’s duty to examine caused any loss to the Noteholders. Id. at 482-87. The court reasoned that, had BT examined the certificates, noted the absence of the required language, and called that deficiency to Semi-Tech’s attention, Semi-Tech would, so far as all the evidence showed, have provided conforming certificates, curing the default. Accordingly, the court awarded nominal damages of $1 by reason of BT’s failure to examine, and otherwise granted summary judgment to BT. Both parties appeal.
Discussion
We agree with the insightful and thorough decisions of the district court, Semi-Tech Litigation, LLC v. Bankers Trust *127 Co., 353 F.Supp.2d 460 (S.D.N.Y.2005), and Semi-Tech Litigation, LLC v. Bankers Trust Co., 272 F.Supp.2d 319 (S.D.N.Y.2003), and adopt those opinions as the law of this Circuit, with one exception: We disagree with the district court’s reasoning supporting its conclusion that BT did not breach a duty under TIA § 315(b) to give the Noteholders notice of Semi-Tech’s nonconforming language.
Section 315(b) required BT to give notice to the Noteholders “of all defaults known to the trustee,” with the option (except as to a default in payment) first to demand cure. While the district court concluded that BT’s delivery of nonconforming certificates constituted defaults under § 315(b), the court reasoned that precisely because BT breached its duty under § 315(a) by failing to examine the certificates for nonconformity with the Indenture, the nonconformities were not “known to the trustee,” and the trustee therefore did not violate § 315(b) in failing to give notice to the Noteholders of those defaults. 353 F.Supp.2d at 479-80. According to the district court’s analysis, BT’s knowledge of the nonconformity was a condition precedent of its obligations under § 315(b). Because it failed to inspect the certificates, as it was required by § 315(a) to do, BT never knew of the nonconformity. The condition precedent to its obligation under § 315(b) never occurred, and it therefore had no obligation to act.
We disagree. Because BT had a duty under § 315(a) to examine the certificates, its failure to do so cannot excuse its failure to comply with the duty under § 315(b) to take action with respect to known defaults. As Judge Friendly explained in Spanos v. Skouras Theatres Corp., 364 F.2d 161, 169 (2d Cir.1966) (in banc), “ ‘One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.’ ” (quoting 3A Arthur L. Corbin, CORBIN ON CONTRACTS § 767, at 540 (I960)).
BT argues that the principle articulated in Spanos applies only where a party has taken affirmative steps to prevent the occurrence of a condition precedent. According to BT, the reasoning in Spanos is inapplicable where the condition precedent failed to occur as a result of a party’s inaction. BT argues that because it did not take affirmative action to prevent the occurrence of the condition precedent, it was properly excused from the duties that would have arisen had it known of the nonconformity.
There is language in a 1931 decision of the New York Court of Appeals, Amies v. Wesnofske, 255 N.Y. 156, 163, 174 N.E. 436 (1931), which we quoted in Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir.1989), which BT contends supports it position that only its active hindrance, not passive hindrance, can result in its waiver of the condition precedent. BT, however, misunderstands the passage on which it relies.
Amies was a suit for payment of a real estate brokerage fee. The plaintiffs were brokers, who introduced the defendants to prospective buyers of defendants’ property. Defendants and the brokers’ buyers entered into a contract of sale; the defendants and plaintiffs simultaneously entered into a brokerage agreement, calling for the broker’s fee, of which one-half was paid immediately, the second half to be paid upon the closing. The buyers backed out of the purchase, so that the closing never took place. The sellers declined to pay the *128 balance of the brokerage fee due at closing, and the brokers brought suit, claiming that the condition precedent to payment (the closing) was waived by the sellers’ failure to seek specific performance and thereby bring about the condition precedent. Amies, 255 N.Y. at 158-59, 174 N.E. 436. The Court of Appeals ruled for the sellers. They were under no obligation to pay the balance of the fee.
Acknowledging the “well settled and salutary rule that a party cannot insist upon a condition precedent, when its nonperformance has been caused by himself,” the Court of Appeals explained that “generally ... a vendor is under no duty to his broker to enforce specific performance by the vendee, when commissions are conditioned upon performance.” Id. at 163-64, 174 N.E. 436. Where a promisor has no duty to bring about the condition precedent to his promise, only active conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent. Therefore, only affirmative steps by the defendants to prevent the closing would have constituted waiver of the condition precedent; “[p]as-sive acquiescence in [the buyers’] declared default and its consequences was not an act of prevention or hindrance.” Id. at 165, 174 N.E. 436. BT relies on the court’s assertion that a finding of waiver of the precondition of the promise depends on “active conduct of the [ ] promisor, preventing or hindering the fulfillment of the condition.... No such doctrine [of waiver] can be efficacious to compel positive action by the promisor to bring about the performance of the condition.” Id. at 163, 174 N.E. 436. BT’s quotation, however, omits further discussion in Amies, which is necessary to understand the full contours of the rule the court described. Taking in context the court’s full explanation, it rejects BT’s position.
According to Amies, the reason why a waiver of the condition would be triggered only by active conduct hindering the fulfillment of the condition, and not by failure to act, was that the vendor owed no duty to the brokers to take active steps to compel the buyers’ performance. It would be otherwise had the sellers owed the brokers a duty to take steps to compel the buyers’ performance of the contract of sale. The sentence following the words quoted by BT explains this: “No such doctrine [of waiver] can be efficacious to compel positive action by the promisor to bring about the performance of the condition. For that result the implication of a promise would be requisite." Id. (emphasis added). The sellers had made no promise to the brokers to take steps to enforce the buyers’ performance. Had there been such a promise, it is clear the result would have been the opposite.
BT’s case differs from Amies in just this respect. The sellers in Amies had made no promise (and had no duty) to the brokers to sue for specific performance. In those circumstances, according to the Amies court, only active frustration of the occurrence of the condition precedent would constitute waiver of the precondition. BT, in contrast, was under a statutory and contractual duty to examine the certificates furnished by Semi-Tech to determine whether they conformed to the requirements of the Indenture. That duty was expressly imposed by TIA § 315(a), and under Indenture § 601 BT undertook “the duties and responsibilities of the Trustee ... as provided by the Trust Indenture Act.” Thus, the specification by the Amies court that active hindrance alone can constitute a waiver of the condition precedent has no application to BT.[4]
*129 BT did not know of Semi-Tech’s defaults because it failed to take the steps it had promised it would take to learn of defaults. Its failure to fulfill its affirmative duty to inspect the certificates “unjustly prevented] the performance” of its duty to give notice of the nonconformities. BT is “not ... permitted to take advantage of [its] own wrong.” Spanos, 364 F.2d at 169. We therefore disagree with the reasoning that led the district court to the conclusion that BT did not breach a duty to give the Noteholders notice of Semi-Tech’s defaults in the language of the certificates.
Nevertheless, even if BT had been punctilious in its inspection of the certificates and had scrupulously performed its duties under the TIA, this would not have prevented the Noteholders’ losses. As the district court observed, the duty to give notice of default under § 315(b) is not absolute. Rather, § 315(b) states that (except in the case of default in the payment of the principal or interest) a “trustee shall be protected in withholding [notice of default] if and so long as the board of directors, the executive committee, or a trust committee of directors and/or responsible officers, of the trustee in good faith determine that the withholding of such notice is in the interests of the indenture security holders.” 15 U.S.C. § 77ooo(b). BT’s corporate trust committee had determined that it was not in the best interest of indenture security holders to receive notice of default upon BT’s receipt of nonconforming documentation; rather, BT’s practice was to call the deficiency to the attention of the obligor and request conforming documentation.[5] 353 F.Supp.2d at 485. Thus, in order to satisfy its duty under § 315(b), BT could have (1) given notice to the Noteholders of the noncon-formities; or (2) requested conforming certificates from Semi-Tech and received such certificates.
The district court, in its thorough analysis of BT’s breach of its duty to inspect under § 315(a), concluded that, so far as the evidence showed, had BT been aware of the nonconformities, it would have followed its policy of pointing out the defi *130 ciencies to Semi-Tech, which would have cured the default by supplying conforming certificates. Plaintiff failed to submit evidence that could support a finding that BT’s breach of its duty under § 315(a) to inspect the certificates was a cause-in-fact of plaintiffs losses. 353 F.Supp.2d at 482-87. The same reasoning precludes plaintiff from recovery by reason of any breach of duty under § 315(b) to give notice to the Noteholders or to request and receive conforming certificates from Semi-Tech. So far as the evidence shows, had BT been aware of the nonconforming language, it would have sought and received conforming certificates from Semi-Tech. BT would not have been required to give the Noteholders any notice of default. Plaintiff failed to show that any breach of BT’s duties was the cause of any loss to the Noteholders.
Conclusion
The judgment of the district court is affirmed.

. The district court determined — and the parties do not contest — that BT's duties under the *123 TIA and the Indenture were identical (as each incorporates by reference the duties required by the other), and that BT’s duties under New York law were, as relevant to this case, the same as those imposed by the Indenture. See 353 F.Supp.2d at 472.

. Section 314(f) also states:
Nothing in this section shall be construed either as requiring the inclusion in the indenture to be qualified of provisions that the obligor upon the indenture securities shall furnish to the indenture trustee any other evidence of compliance with the conditions and covenants provided for in the indenture than the evidence specified in this section, or as preventing the inclusion of such provisions in such indenture, if the parties so agree.

. Section 102 provides in relevant part:
Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include (1)a statement that each individual or firm signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;
(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;
(3) a statement that, in the opinion of each such individual or firm, it has made such examination or investigation as is necessary to enable it to express an informed opinion as to whether or not such covenant or condition has been complied with; and
(4) a statement as to whether, in the opinion of each such individual or firm, such condition or covenant has been complied with.

. It is not clear whether the New York Court of Appeals would adhere today to the distinc *129 tion it espoused in 1931 between active and passive frustration. The more pertinent consideration, as espoused by the Restatement (Second) of Contracts, seems to be the scope of the promisor's duty to the promisee with respect to the condition. The Restatement takes the position that a condition precedent "may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing." RESTATEMENT (SECOND) OF CONTRACTS § 225 cmt. b (1981). It makes no mention of whether the hindrance is effectuated through active or passive conduct. If the promisor is under a duty to the promisee to do what it can to bring about the realization of the condition, the failure to do so, whether by active or passive steps, would seem to breach that duty and waive the condition. In contrast, if the seller has no duty of any kind with respect to realization of the condition (as would be the case where the promisor's obligation depends on whether the promisor decides to accept the benefits of the condition), the promisor's frustration, of the occurrence of the condition, even by active conduct, should not occasion a waiver. In Amies, had the buyers been willing, but the defendant sellers had passively refused to go through with the sale, we wonder whether the court would adhere to the active-passive distinction it described. Under the Restatement approach, the answer should depend on whether the sellers had a good-faith obligation to the brokers to close, rather than on whether the sellers' prevention of the closing was achieved through active or passive conduct. Judge Straub does not join in this footnote.

. As the district court noted, the evidence in the record suggests that such a position is common among indenture trustees. Plaintiff's own expert witness testified that he could not recall any instance in which an indenture trustee gave notice of default because it had received nonconforming documentation. 353 F.Supp.2d at 485.