**SEMI–TECH LITIGATION, LLC, Plaintiff,**

v.

**BANKERS TRUST COMPANY, Defendant.**

**No. 02 Civ.0711(LAK).**

United States District Court, S.D. New York.

Jan. 21, 2005.

Robert I. Bodian, Kevin Ainsworth, Mintz Levin Cohen Ferris Glovsky and Popeo, P.C., New York, NY, for Plaintiff.

Edward Flanders, F. Joseph Owens, Jr., Pillsbury Winthrop LLP, New York, NY, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case is an object lesson in how seemingly minor oversights can become the subject of major litigation.

Defendant Bankers Trust Company ("BT") was the trustee under an indenture for a 1993 note offering by Semi–Tech Corporation ("Semi–Tech" or the "Company") that raised $300 million to fund the Company's purchase of 51 percent of the shares of The Singer Company N.V. ("Singer"). Semi–Tech subsequently entered bankruptcy. The plaintiff holds the assigned claims of certain holders of the notes issued in the 1993 offering. It alleges that the defendant breached statutory, contractual, and fiduciary duties by failing to examine certain documents and give certain notices and that the defendant is therefore liable for the losses allegedly suffered by the noteholders after Semi–Tech entered into transactions that are said to have diminished the value of the notes. The matter now is before the Court on the defendant's motion for summary judgment dismissing the complaint.

I. Factual and Legal Background

*A. The 1993 Offering and the Indenture*

In August 1993, Semi–Tech,[1] a Canadian holding company controlled by James Ting, raised $300 million by issuing Senior Secured Discount Notes (the "Notes") in a public offering registered in the United States. The Notes were scheduled to mature in 2003 and had a stated amount at maturity of $654,193,000. The offering was used to help Semi–Tech purchase, from a related holding company named Semi–Tech (Global) Company Limited ("Global"), 51 percent of the shares of Singer, a Netherlands Antilles corporation that, together with its affiliates, manufactured and marketed sewing machines and other consumer products. Under a related Pledge Agreement, some of the Singer shares were pledged as security for the Notes.[2]

The Notes were issued under an indenture agreement between Semi–Tech and BT as indenture trustee. A number of provisions of the indenture are at issue here.

The indenture provides that if an Event of Default occurs and is continuing and certain notices have been given, the Default Amount of the Notes—defined, as relevant here, as the issue price plus accrued interest—would immediately become due and payable.[3] "Event of Default" is defined in Section 501 of the indenture as any of a number of events, including:

(A) a default in the payment of principal or interest;[4]

(B) filing of bankruptcy or other similar proceeding;[5]

(C) "the failure by the Company to comply for 30 days after notice with any of its obligations under" a set of

1. The Company's name at the time of the offering was International Semi–Tech Micro-electronics Inc.

2. Def. Ex. 1 ("Ind."); Ex. 87.

3. Ind. §§ 502, 101.

4. *Id.* § 501(1), (2).

5. *Id.* § 501(11), (12).

indenture covenants that, among other things, limited the amount of additional debt that the Company, Singer, and Singer's subsidiaries could incur, limited payments the Company could make, and limited the extent to which the Company and its subsidiaries could enter into transactions with affiliated entities;[6] and

(D) "default in the performance, or breach, of any covenant or warranty of the Company in this Indenture" not otherwise dealt with in the section defining Event of Default, "and continuance of such default or breach for 60 days after" the Trustee gives a "Notice of Default" to the Company or a certain percentage of noteholders give a "Notice of Default" to the Trustee and the Company.[7]

The term "default," as distinct from "Event of Default," is not defined in the definitions section of the indenture.[8]

Article Six of the indenture is entitled "The Trustee." Section 601 provides that "[t]he duties and responsibilities of the Trustee shall be as provided in the Trust Indenture Act."[9] Section 602 states:

"The trustee shall give the Holders notice of any default hereunder as and to the extent provided by the Trust Indenture Act; *provided, however,* that in the case of any default of the character specified in Section 501(6),[10] no such no-

tice to Holders shall be given until at least 30 days after the occurrence thereof. For the purpose of this Section, the term 'default' means any event which is, or after notice or lapse of time or both would become, an Event of Default."[11]

Section 603 is titled "Certain Rights of Trustee." It provides, as relevant here:

"Subject to the provisions of Section 601 in acting hereunder . . .:

"(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request . . . or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

\* \* \* \* \* \*

"(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request . . . or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit. . . ."[12]

The indenture required the Company periodically to deliver to BT several types of certificates stating that the Company was in compliance with its obligations under the indenture, known as "no-default"

---

6. *Id.* § 501(6).

7. *Id.* § 501(10).

8. *See id.* § 101.

9. *Id.* § 601.

10. Section 501(6) is the provision defining as an Event of Default a failure to comply for 30 days after notice with a set of covenants limiting, among other things, the amount of addi-

tional debt that Semi–Tech, Singer, and Singer's subsidiaries could incur, the payments Semi–Tech could make, and the extent to which Semi–Tech and its subsidiaries could enter into transactions with affiliated entities.

11. *Id.* § 602.

12. *Id.* § 603.

certificates.[13] Section 1017(a) required annual no-default certificates from officers of Semi–Tech:

> "The Company will deliver to the Trustee, within 140 days after the end of each fiscal year of the Company ... an Officers' Certificate,[14] stating whether or not to the best knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of" [a number of specified covenants, including the ones dealing with prohibited transactions], "and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge." [15]

Section 1017(b) is nearly identical, except that it required quarterly certificates.

The Company was obligated to provide as well annual certificates from its auditors. Section 1017(d) provides:

> "The Company shall deliver to the Trustee within 140 days after the end of each fiscal year a written statement by the Company's independent public accountants stating (A) that their audit examination has included a review of the terms of this Indenture and the [Notes] as they relate to accounting matters, and (B) whether, in connection with their audit examination, any event which, with notice or the lapse of time or both, would constitute an Event of Default has come to their attention and, if such a default has come to their attention, spec-

ifying the nature and period of the existence thereof." [16]

Finally, Section 102 of the indenture sets forth requirements that applied to a range of certificates and opinions (the "Section 102 Language") and is at the heart of the allegations against BT:

> "Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include
>
> "(1) a statement that each individual or firm signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;
>
> "(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;
>
> "(3) a statement that, in the opinion of each such individual or firm, it has made such examination or investigation as is necessary to enable it to express an informed opinion as to whether or not such covenant or condition has been complied with; and
>
> "(4) a statement as to whether, in the opinion of each such individual or firm, such condition or covenant has been complied with." [17]

## B. The Trust Indenture Act

As will be discussed in more detail below, the plaintiff alleges that BT violated

---

**13.** *See, e.g.,* ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION AND MANAGEMENT 82 (5th ed. 1998) ("LANDAU & KRUEGER"); AMERICAN BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS 1965, at 326 (1971) ("ABF COMMENTARIES").

**14.** "Officers' Certificate" is defined in the indenture as "a certificate signed by the Chairman of the Board, the President or a Vice President, and by the Treasurer, an Assistant President

Treasurer, the Secretary or an Assistant Secretary, of the Company, and delivered to the Trustee." Ind. § 101, at 14.

**15.** *Id.* § 1017(a).

**16.** *Id.* § 1017(d).

**17.** *Id.* § 102.

the Trust Indenture Act of 1939 (the "TIA"),[18] Section 315 [19] of which prescribes duties for indenture trustees. The portion of the statute relevant here is as follows:

"(a) Duties prior to default

"The indenture to be qualified shall automatically be deemed ... to provide that, prior to default (as such term is defined in such indenture)—

(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and

(2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture;

but the indenture trustee shall examine the evidence furnished to it pursuant to section 314 [i.e. 15 U.S.C. § 77nnn] to determine whether or not such evidence conforms to the requirements of the indenture.

"(b) Notice of defaults

"The indenture trustee shall give to the indenture security holders, in the manner and to the extent provided in subsection (c) of section 313 [i.e. 15 U.S.C. § 77mmm], notice of all defaults known to the trustee, within ninety days after the occurrence thereof: *Provided,* That such indenture shall automatically be deemed ... to provide that, except in the case of default in the payment of the principal of or interest on any indenture security ... the trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors and/or responsible officers, of the trustee in good faith determine that the withholding of such notice is in the interests of the indenture security holders.

"(c) Duties of the trustee in case of default

"The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use [20] the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."

Section 314,[21] which is referenced in Section 315(a), is titled "Reports by obligor; evidence of compliance with indenture provisions." It requires an obligor, among other things, to furnish the trustee with an annual certificate of compliance from an officer,[22] and it provides that an

---

18. 15 U.S.C. § 77aaa *et seq.*

19. 15 U.S.C. § 77ooo (2004).

20. The word "to" appears to have been left over erroneously from an earlier version of the statute. *See* 15 U.S.C. § 77ooo (1988); Trust Indenture Reform Act of 1990, Pub.L. No. 101–550, Title IV, § 414(3), 104 Stat. 2713, 2730 (1990).

21. 15 U.S.C. § 77nnn.

22. The exact text of the provision, as relevant here, is as follows:

"Each person who, as set forth in the registration statement or application, is or is to be an obligor upon the indenture securities covered thereby shall ... (4) furnish to the indenture trustee, not less often than annually, a brief certificate from the principal executive officer, principal financial officer or principal accounting officer as to his or her knowledge of such obligor's compliance with all conditions and covenants under the indenture. For purposes of this paragraph, such compliance shall be determined without regard to any period of grace or requirement of notice provided under the in-

indenture may require the provision of additional documentation of compliance with the indenture beyond what is set forth in the statute.[23]

### C. Challenged Documentation

From 1993 to 1998, the annual and quarterly officers' no-default certificates required by Section 1017(a) and (b) of the Indenture did not include the Section 102 Language. The text of the 1994 annual certificate, for example, was as follows:

"Officers' Certificate

"To the Trustee of the Senior Secured Discount Notes due 2003

"We write to you in accordance with Section 1017(a) of the Trust Indenture dated August 18, 1993. To the best of our knowledge the Company is not in default in the performance and observance of any of the terms, provisions and

conditions of Section 801 or Sections 1004 to 1016, inclusive of the Trust Indenture.

July 22, 1994" [24]

It was signed by James H. Ting, identified as "Chairman, President & Chief Executive Officer"; Frank E. Holmes, "Executive Vice President, Chief Operating Officer & Secretary"; and Chuck C.H. Tam, "Executive Vice President & Chief Financial Officer." The annual and quarterly certificates for 1995, 1996, 1997, and 1998 were identical to that quoted above, save for the dates and, in the quarterly certificates, a reference to Section 1017(b) in place of Section 1017(a).[25] A quarterly no-default certificate dated March 9, 1999 and signed by Tam and Holmes, but not Ting, contained all of the Section 102 Language except that specified in Section 102(2).[26]

---

denture." TIA § 314(a)(4), 15 U.S.C. § 77nnn(a)(4).

23. The relevant provision states:

"Nothing in this section shall be construed either as requiring the inclusion in the indenture to be qualified of provisions that the obligor upon the indenture securities shall furnish to the indenture trustee any other evidence of compliance with the conditions and covenants provided for in the indenture than the evidence specified in this section, or as preventing the inclusion of such provisions in such indenture, if the parties so agree." TIA § 314(f), 15 U.S.C. § 77nnn(f).

24. Def. Ex. 23.

25. Id.

The record contains two versions of the 1997 annual certificate, both dated August 14, 1997. One version does not contain Ting's signature and has immaterially different text. See Pl. Exs. 88, 89. The Company submitted two annual certificates in 1998 that mentioned § 1017(a), one dated June 3, the other August 7. The June 3 certificate has Holmes' and Tam's signatures but not Ting's. The August 7 certificate has Ting's and Holmes'

signatures but not Tam's. A quarterly certificate dated November 12, 1997 has Holmes' and Tam's signatures but not Ting's. The Company submitted two annual certificates in 1996, one dated June 26, the other November 1. They are otherwise identical. See Def. Ex. 23.

26. Id.

As set forth above, § 102(2) calls for "a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based." The March 9 certificate's text, as relevant here, was as follows:

"Officer's Certificate

"We, the undersigned, hereby certify, on behalf of the Borrower and not in our personal capacity, as follows:

1. We have furnished this certificate pursuant to Section 1017(b) of the Indenture.

2. We have read and are familiar with the provisions of the Indenture.

3. We have made or caused to be made such examinations or investigations as are, in our opinion, necessary to make the statements contained in this certificate.

The Company furnished also certificates dated August 7, 1998 and November 26, 1998 that were substantially identical to the March 9 quarterly certificate—and therefore lacked the language of Section 102(2)—except that the August 7 and November 26, 1998 certificates purported to be furnished pursuant to Section 314(a)(4) of the TIA.[27]

From 1995 to 1998, the accountant's certificates required by Section 1017(d) of the indenture did not include the precise language of clauses (A) and (B) of Section 1017(d). The text of the certificate dated July 11, 1995, for example, which was signed by Ernst & Young ("E & Y"), was as follows:

"Review Engagement Report

"To Bankers Trust Company

"We have reviewed Semi–Tech Corporation's compliance as at March 31, 1995 with items (1) through (4) and items (6) through (13) of Section 501 of the Trust Indenture dated August 18, 1993 regarding the Senior Secured Discount Notes due 2003. We understand that no notice was provided to the company with respect to items (6), (7) or (10) of Section 501. Our review was made in accordance with generally accepted standards for review engagements and accordingly consisted primarily of enquiry, analytical procedures and discussions related to information supplied to us by the company.

"A review does not constitute an audit and consequently we do not express an audit opinion on this matter.

"Based on our review, nothing has come to our attention that causes us to believe that the company is not in compliance with items (1) through (4) and items (6) through (13) of Section 501 [which defines Event of Default] of the Trust Indenture referred to above."[28]

The texts of the 1996 certificate, also signed by E & Y, and the 1998 certificate, signed by Deloitte & Touche ("D & T"), were identical to this, aside from the dates.[29] The 1997 certificate, signed by E & Y, was different. In addition to the standard language, it mentioned an agreement under which Singer was to transfer certain consideration to a wholly-owned subsidiary of Global as settlement for Singer's purchase from the subsidiary of the shares of Singer Furniture Company. The certificate went on to note that that agreement had been nullified and stated that, except for that agreement, nothing had come to the accountants' attention to cause them to believe that Semi–Tech was not in compliance with the relevant items in Section 501 of the indenture.[30]

## D. BT's Responses

On August 19, 1997 BT sent a letter to Semi–Tech stating, among other things, that certain documents, including a quarterly officers' certificate from November 1996 and the accountant's certificate from 1996, had not been provided and requesting that the situation be corrected.[31] BT

---

4. To the best of our knowledge, information and belief, after due inquiry, the Borrower is not in default in the performance and observance of any of the terms, provisions and conditions of Section 801 and Sections 1004 to 1016 inclusive of the Indenture." Def. Ex. 23.

27. *See id.* TIA § 314(a)(4) is codified at 15 U.S.C. § 77nnn(a)(4). As indicated above, *see*

footnote 22, the provision requires annual officer's certificates of compliance.

28. Pl. Ex. 32.

29. Pl. Exs. 53, 158.

30. Pl. Ex. 90.

31. Pl. Ex. 93.

followed that letter with another dated October 8, 1997, that time requesting only, as relevant here, the 1996 accountant's certificate.[32] On September 18, 1998 BT sent a letter to Holmes informing him that, among other things, BT had not received the compliance certificate required by Section 314(a)(4) of the TIA and that D & T's 1998 certificate did not contain the statements required by Section 1017(d).[33] BT did receive the 1996 accountant's certificate, as well as certificates referencing Section 314(a)(4) of the TIA, but it never received an amended accountant's certificate for 1998 from D & T.

The parties have not called the Court's attention to any other evidence that BT, after receiving potentially non-conforming documentation from Semi–Tech, attempted to obtain conforming documentation.

In January 1999, a court proceeding was instituted in Ontario on behalf of the holders of 70 percent of the Notes in an attempt to force Semi–Tech into bankruptcy.[34] BT resigned as trustee effective May 11, 1999.[35]

### E. The Challenged Transactions and the Collapse of Singer

In the late 1990s, Singer experienced economic difficulties that allegedly reduced the value of the Notes—Singer shares were Semi–Tech's chief asset as well as the collateral for the Notes—and that culminated in Singer's filing for bankruptcy in New York on September 12, 1999. At least some of Singer's troubles apparently were due to financial crises in Asia and Latin America as well as to Singer's deteriorating competitiveness worldwide.[36] But it is essentially undisputed that Singer's problems were due also to several transactions from 1997 to 1999 that, according to the plaintiff, violated the indenture (the "Challenged Transactions").[37]

These included principally Singer's acquisition of Singer Furniture Company from a subsidiary of Global, which was announced in 1995;[38] a May 1997 issuance by Singer do Brasil Indústria e Comércio Ltda., a Singer subsidiary, of $50 million of debt;[39] and Singer's December 1997 purchase of G.M. Pfaff AG, a German sewing machine company largely owned by Global, for $157.5 million.[40] Also, Singer entered into an agreement to acquire a Russian sewing machine company that never closed, but that resulted in substantial losses when Singer transferred funds, allegedly to Global, in anticipation of the closing.[41]

### F. Semi–Tech's Bankruptcy and the Formation of the Plaintiff

Semi–Tech filed for bankruptcy in the Southern District of New York on September 7, 1999. The plaintiff, a Delaware

**32.** Pl. Ex. 97.

**33.** Pl. Ex. 161.

**34.** Def. Ex. 35; Ross Decl. ¶ 25.

**35.** Ross Decl. ¶ 31; Def. 56.1 St. ¶ 89; Pl. 56.1 St. ¶ 89.

**36.** *See* Def. Ex. 60 at 1; Ex. 113; Ex. 122.

**37.** *See* Pl. Ex. 245 ¶¶ 45–57 (affidavit of Singer's chief executive filed in connection with bankruptcy proceedings); Def. Ex. 100 at 23–

25 (disclosure statement filed with respect to Singer's reorganization plan). *See also* Def. Exs. 60, 65 (reports that rating service downgraded Semi–Tech and Singer debt due in part to the purchase of Pfaff and Singer's high leverage).

**38.** Def. Ex. 89, 1998 report at 35; Def. 56.1 St. ¶ 31; Pl. 56.1 St. ¶ 31.

**39.** Def. Ex. 72; Ex. 121 at 2; Pl. Ex. 199 at 2.

**40.** Def. Ex. 89, 1998 report at 4, 35.

**41.** Def. Ex. 100 at 23–24.

limited liability company, was created pursuant to the First Amended Plan of Liquidation of Official Committee of Unsecured Creditors for Semi–Tech Group (the "Plan"), which was approved by the bankruptcy court on November 9, 2000.[42] The Plan provided in relevant part that all persons who held Notes as of a particular date,[43] unless they opted out, automatically assigned their claims to the plaintiff in exchange for a membership interest in the plaintiff and in substance a right to participate in any proceeds of litigation brought by the plaintiff.[44] In addition, the Plan allowed persons who held Notes prior to March 16, 2001[45] to opt in to this arrangement.[46]

## II. The Present Action

This action has been the subject of several previous rulings,[47] familiarity with which is assumed. The plaintiff asserts claims stemming from alleged breaches by BT of statutory, contractual, and fiduciary duties. The defendant has moved for summary judgment dismissing the complaint.

### A. Alleged Violations of the TIA

#### 1. Duty to Examine Certificates

The plaintiff contends that officers' certificates submitted under Section 1017(a) and (b) of the indenture are "evidence furnished . . . pursuant to section 314," that the certificates received by BT here did not conform to the requirements of the indenture because they lacked the Section 102 Language and in some cases were not signed by a proper party, and that BT did not notice the discrepancies because it did not examine the certificates properly.

---

**42.** Def. Ex. 97 §§ 1.88, 7.5 (the "Plan"); Pl. Ex. 288 ¶ 1.

**43.** Both parties have been inconsistent about the date. The Plan contemplated that on the Effective Date, which was March 16, 2001, see Pl. Ex. 288 ¶ 2, all causes of action of all "Electing Holders" would be assigned automatically to the plaintiff. Plan § 7.5.3. The Plan defines "Electing Holders" as "the holders of Claims against the Debtors who do not elect to exercise their right to retain their Creditor Causes of Action on or before the Voting Deadline in accordance with Section 7.5.2." Id. § 1.59. This definition arguably includes a person who acquires a claim after the voting date. Seemingly in recognition of this interpretation, the parties at times have used the March 16, 2001 date. See Pl. 56.1 St. ¶ 336 (asserting, with citation to the Plan, that "every person or entity who owned at least one Note on March 16, 2001 (the "Effective Date") is a Member of the Litigation LLC and has assigned its claims related to the Notes . . . in exchange for such membership"); Def. Reply 56.1 St. ¶ 336 (not disputing use of the Effective Date).
Nonetheless, the parties have sometimes used a date of September 15, 2000 for determining which claims were assigned to the plaintiff. See, e.g., Def. Mem. 10; Pl. Mem. 6. September 15, 2000 was the Record Date for purposes of determining who was entitled to vote on whether to accept the Plan, see BT Mot. to Dismiss Ex. E at 4, but it is conceivable that someone who acquired Notes after the Record Date could nonetheless participate in the automatic assignment of claims on the Effective Date. This difference does not affect the disposition of this motion and therefore the Court does not decide which date is correct.

**44.** Plan §§ 1.59, 7.5.2, 7.5.3., 7.5.5., 7.5.12, 7.5.15.

**45.** The definition of "Electing Former Holders" uses the Effective Date, not the voting date, see id. § 1.58, and therefore the ambiguity discussed above in footnote 43 does not appear to apply to former noteholders.

**46.** See id. § 7.5.4.

**47.** The Court dismissed the plaintiff's claims against Semi–Tech's individual directors and officers, Semi–Tech Litig. LLC v. Bankers Trust Co., 234 F.Supp.2d 297 (S.D.N.Y.2002); 2002 WL 31507513 (S.D.N.Y. Nov.8, 2002), and denied BT's motion to dismiss, 272 F. Supp.2d 319 (S.D.N.Y.2003). The plaintiff's claims against accounting firm defendants were dismissed voluntarily pursuant to a stipulation dated December 18, 2002.

Similarly, the plaintiff contends that the accountant's certificates also were "evidence furnished ... pursuant to section 314" and that they did not conform to the requirements of the indenture because they lacked the precise language set forth in Section 1017(d).[48] Accordingly, it claims that BT breached its pre-default duty under Section 315(a) of the TIA to "examine the evidence furnished to it pursuant to section 314 to determine whether or not such evidence conforms to the requirement of the indenture."[49]

### 2. Duty To Give Notice

The plaintiff next argues that the submission of non-conforming certificates was a "default" of which BT would have known if it had complied with its statutory obligations and that BT therefore was obligated to notify the noteholders of the discrepancies. The plaintiff thus alleges that BT breached its duty under Section 315(b) of the TIA to give noteholders "notice of all defaults known to the trustee."

### 3. Duty To Exercise Prudent Person Duties

Finally, the plaintiff argues that Semi-Tech's submission of non-conforming documentation triggered BT's prudent-person

duties under Section 315(c) of the TIA. A prudent person, according to the plaintiff, would have asked for conforming documentation, given the Company a Notice of Default, and examined the Company's financial reports to determine whether the Company had entered into transactions that violated the indenture.

### B. Alleged Breaches of Contractual and Fiduciary Duty

As indicated above, Section 601 of the indenture incorporates by reference the duties of an indenture trustee under the TIA. The plaintiff does not argue that the indenture imposed on BT any duties beyond those set forth in the TIA. Nor has the plaintiff elaborated separately on its claim of breach of common-law fiduciary duty.

### III. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[50] The moving party has the burden of demonstrating the absence of a genuine issue of material fact,[51] and the Court must view the facts in the light most favorable to the nonmoving party.[52] Where the burden of proof at

---

**48.** The accountant's certificates also appear to lack at least some of the Section 102 Language, but the plaintiff has not made this point or even argued that § 102 applies to accountant's statements, so the Court does not consider the issue.

**49.** Additionally, the plaintiff alleges that BT failed to obtain from Semi-Tech certain annual opinions of counsel regarding actions taken to maintain the lien on the collateral pursuant to § 1305(b) of the indenture, and implies that BT failed to require that Semi-Tech submit quarterly reports for some quarters. Since the plaintiff does not discuss the alleged failure to obtain these documents in the argument section of its brief, let alone explain how such failure could be related causally to the plaintiff's losses, the Court does not consider

this issue. The Court does observe, however, that a failure to request a missing document could be a violation of the trustee's pre-default common-law duties. *See* footnote 64 below.

**50.** Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000).

**51.** *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**52.** *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997).

trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[53] In that event, the nonmoving party must come forward with admissible evidence[54] sufficient to raise a genuine issue of fact for trial.[55] The nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," but must set forth specific facts, not mere speculation or conclusory allegations, demonstrating the existence of a genuine issue of material fact.[56]

When a party moves for summary judgment, the court on its own initiative may grant summary judgment for the other party if "it appears clearly upon the record

that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court" and "those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law."[57]

### IV. Which Duties, If Any, Did BT Breach?

The TIA and most indentures calibrate an indenture trustee's duties in an effort to reconcile the interests of debt-holders and indenture trustees.[58] The TIA prescribes two tiers of duties for indenture trustees. Prior to "default (as such term is defined in [the] indenture)," a trustee's duties are limited to what is set forth in the indenture and the statute.[59] After "default (as

53. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir.2001).

54. *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir.2001).

55. *E.g., Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

56. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

57. *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir.1996); *accord Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).

58. *See* 15 U.S.C. § 77bbb(2) (listing the appointment of a trustee without duties adequate to protect investors as one of the harmful practices that the TIA was designed to remedy); *Meckel v. Cont'l Resources Co.*, 758 F.2d 811, 815–16 (2d Cir.1985) ("Trust indentures are important mechanisms for servicing corporate debt and banks play an essential role in the process that brings corporate financings to the public market. It is important that a bank's obligations with respect to notice be limited to those agreed

upon....That Congress recognized these significant economic considerations is reflected in [Section 315(a)(1)] of the Trust Indenture Act."); ALI, 1 FEDERAL SECURITIES CODE xl (1980) ("It has been persuasively urged that extension of the 'prudent man' test for purposes of *ascertaining the occurrence of a default* ... would be impractical and prohibitively expensive in terms of increased trustees' fees."); *see also Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir.1988) (recounting that in hearings on the original TIA, "representatives of several financial institutions expressed concern over the imposition of pre-default duties in excess of those duties set forth expressly in the indenture").

59. TIA § 315(a)(1), 15 U.S.C. § 77ooo(a)(1); *Elliott Assocs.*, 838 F.2d at 70–71; *Meckel*, 758 F.2d at 816; *Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A.*, No. 95 Civ. 1924(MBM), 1996 WL 694345, at *4 (S.D.N.Y. Dec. 4, 1996). *Elliott* and *Meckel* hold that prior to default, an indenture trustee is liable only for the duties explicitly set forth in the indenture. Those cases do not mention duties arising out of the statute. Those cases, however, were decided at a time when the TIA did not impose duties on trustees directly but instead governed the content of the indentures that in turn governed trustees. The earlier version of the TIA, as discussed below,

such term is defined in [the] indenture)," a trustee is held to a prudent person standard.[60] BT's contractual duties were identical to its statutory duties, because the indenture incorporates the TIA duties by reference.

■■■■ The fiduciary duties to which BT was subject under New York's common law were identical to the statutory duties or nearly so. "Under New York law, the pre-default duties of an indenture trustee ... generally are limited to the duties imposed by the indenture." [61] After an event of default, the trustee is held to the prudent person standard.[62] In addition, prior to default, a trustee may be liable "for failure to perform basic non-discretionary ministerial tasks" not specified in the indenture.[63] In this case, however, the

question whether the defendant failed to perform non-discretionary ministerial tasks is for the most part the same as whether the defendant fulfilled its obligations under the TIA and the indenture.[64] In any case, the parties apparently have assumed that the state law duties are co-extensive with the federal ones. For purposes of determining the duties BT breached, therefore, the Court considers only the statute.

## A. Section 315(a) Duty To Examine

### 1. Extent of the Duty

This appears to be the first case in which a party has sought to impose liability on an indenture trustee for an alleged failure to fulfill the Section 315(a) requirement that the trustee "examine the evi-

required the indenture to prescribe a duty to examine § 314 evidence. See 15 U.S.C. § 77ooo(a) (1988). At present that duty derives directly from the statute.

**60.** TIA § 315(c), 15 U.S.C. § 77ooo(c); *LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*, 308 F.3d 169, 171 (2d Cir.2002); *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 85 F.3d 970, 973 (2d Cir.1996); *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, No. 92 Civ. 7584 MBM, 1997 WL 528283, at *16 (S.D.N.Y. Aug. 27, 1997).

**61.** *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, 935 F.Supp. 1333, 1346 (S.D.N.Y.1996); *accord Hazzard v. Chase Nat'l Bank of the City of New York*, 159 Misc. 57, 80–81, 287 N.Y.S. 541, 566–67 (1936), *aff'd*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't), *aff'd*, 282 N.Y. 652, 26 N.E.2d 801; *Green v. Title Guarantee & Trust Co.*, 223 A.D. 12, 15, 227 N.Y.S. 252, 256 (1st Dep't 1928), *aff'd*, 248 N.Y. 627, 162 N.E. 552; *N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 163 M.2d 551, 556–57, 621 N.Y.S.2d 466, 470 (1994); *AMBAC Indem. Corp. v. Bankers Trust Co.*, 151 Misc.2d 334, 336–38, 573 N.Y.S.2d 204, 206–07 (1991).

**62.** *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 12–13, 632 N.Y.S.2d 520, 527–28 (1st Dep't 1995).

**63.** *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, 935 F.Supp. at 1347 (citing *N.Y. State Med. Care Facilities Fin. Agency*, 163 Misc.2d at 557, 621 N.Y.S.2d at 470–71).

**64.** One potential exception is BT's alleged failure to request certain missing documents from Semi–Tech. See footnote 49 above. A duty to request missing documents is not set forth in the statute or the indenture, but it is at least arguable that the trustee's basic ministerial functions include ensuring that the trustee has received each document required under the statute and the indenture. See LANDAU & KRUEGER 339 (listing, as one of an indenture trustee's standard functions in connection with its fiduciary obligations, the monitoring of "[a]ll items requiring periodic attention and/or documentation ... for follow-up and completion sign-off each month"). The Court, however, need not decide whether these alleged omissions by BT constitute a breach of fiduciary duty under New York common law. The plaintiff does not make much of these alleged omissions, and more importantly, under the plaintiff's theories of causation, those omissions cannot have caused any more damage than the other complained-of omissions.

dence furnished to [the trustee] pursuant to Section 314 [of the TIA] to determine whether or not such evidence conforms to the requirements of the indenture." There are two issues here. First, were the certificates in question "evidence furnished ... pursuant to Section 314" of the TIA? Second, if they were, did Section 315(a) impose on BT an independent duty to examine them for conformity to the indenture?

 a. Were the challenged certificates "evidence furnished ... pursuant to Section 314"?

BT takes the position that the certificates were furnished only pursuant to Section 1017 of the indenture, not Section 314 of the TIA, and that an annual certificate "as to [the officer's] knowledge of [the] obligor's compliance with all conditions and covenants under the indenture" (Section 314(a)(4) of the TIA) is different from an annual officers' certificate "stating whether or not to the best knowledge of the signers thereof the Company is in default in the performance and observation of any of the terms, provisions, and conditions" of the indenture's major covenants (Section 1017(a) of the indenture).[65] The distinc-

tion is unpersuasive. A statement that satisfies one will almost always satisfy the other. If the obligor is not in default, then it is in compliance, and the inverse is true as well.[66]

In any event, BT's argument, even if accepted, would not avail it. If the certificates submitted in fulfillment of Section 1017 were not "evidence furnished ... pursuant to section 314," then Semi–Tech failed to submit a Section 314(a)(4) certificate for every year but 1998. And that would raise a serious question as to whether BT breached a pre-default duty to request missing documentation.[67]

BT argues also that, because Section 314 does not require quarterly officers' certificates or annual auditors' certificates, the certificates required by Section 1017(b) and (d) were not furnished "pursuant to section 314." But Section 314(f) specifically states that Section 314 does not prevent the inclusion in an indenture of provisions requiring additional documentation of compliance with the indenture—provisions, in other words, like Section 1017(b) and Section 1017(d). BT urges no persuasive reason to limit "pursuant to Section 314" to mean "required by Section 314."

---

**65.** BT argues also that the § 1017 certificates are not "evidence" because they are not offered to prove anything and because the purpose of those certificates is simply to notify the trustee of defaults of which Semi–Tech officers and auditors have knowledge. This hypertechnical argument barely merits consideration. The Court nonetheless notes, first, that under various provisions of § 314, certificates and opinions are considered "evidence" even though such secondary documents are, like the § 1017 statements, assurances by persons with knowledge, not direct proof. *See* TIA § 314(b), (c), (f), 15 U.S.C. § 77nnn(b), (c), (f). BT's attempt to make epistemological distinctions between certificates furnished pursuant to § 314(c) (which BT acknowledges are evidence) and certificates furnished pursuant to § 314(a)(4) (or, as

BT would have it, § 1017 of the indenture) is incoherent.

Second, Congress easily could have used references to specific subsections of § 314 in place of the general reference to § 314 in § 315(a). Since Congress did not do so, there is no reason to assume that it meant to exclude § 314(a)(4) or any other subsection of § 314 from the § 315(a) duty to examine.

**66.** Indeed, § 314(a)(4), 15 U.S.C. § 77nnn(a)(4), which was added to the TIA in 1990, "converted what was a commonly used affirmative undertaking"—requiring annual officers' certificates of compliance—"into a new, legislatively mandated covenant." LANDAU & KRUEGER 134.

**67.** *See* footnote 64 above.

b. Did Section 315(a) impose an independent duty to examine the certificates for conformity to the indenture's requirements?

■ This is the more significant question. The relevant statutory language is as follows:

"(a) Duties prior to default

"The indenture to be qualified shall automatically be deemed ... to provide that, prior to default (as such term is defined in such indenture)—

(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and

(2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture;

but the indenture trustee shall examine the evidence furnished to it pursuant to section 314 [i.e. 15 U.S.C. § 77nnn] to determine whether or not such evidence conforms to the requirements of the indenture." [68]

The plaintiff argues that the "but" clause modifies all that precedes it and thus imposes on the trustee an independent duty to examine documents for conformity. BT, relying primarily on the legislative history and the comparable provision in the Model Debenture Indenture (the "Model Indenture") of the American Bar Foundation, takes the position that the "but" clause limits only the (a)(2) right to rely on the truth and correctness of certificates and opinions conforming to the requirements of the indenture and imposes no independent duty to examine documents.

In considering BT's argument, it is important to bear in mind that the TIA as enacted in 1939 was slightly different from the current version. Until 1990, the statute did not govern a trustee directly. It governed the content of the indenture, which in turn governed the trustee.[69] The pre–1990 Section 315(a), however, *required* that an indenture contain provisions that required the trustee to examine documentation for conformity with this indenture. This statutory requirement was not in *form a condition of 315(a)(2), which per-mitted* an indenture to provide that a trustee was *permitted* to rely on the truth of matters expressed in conforming documentation.[70]

■ With this background, we turn to BT's historical argument. BT relies principally on the portion of the section-by-section analysis of the House committee

---

**68.** TIA § 315(a), 15 U.S.C. § 77*ooo*(a).

**69.** The pre–1990 Section 315(a) was as follows:

"(a) The indenture to be qualified may provide that, prior to default (as such term is defined in such indenture)—

(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and

(2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture;

but such indenture shall contain provisions requiring the indenture trustee to examine the evidence furnished to it pursuant to section 314 to determine whether or not such evidence conforms to the requirements of the indenture." Trust Indenture Act of 1939, Pub.L. No. 76–253, § 315(a), 53 Stat. 1149, 1171 (1939).

**70.** *See id.*

report on what became the TIA which dealt with what now is Section 315(a). The report stated, in relevant part:

"Paragraph (1) makes clear that, prior to default, the trustee is to be liable for the performance of only such duties as are specifically set out in the indenture.

"Paragraph (2) permits the inclusion of provisions authorizing the trustee to rely upon certificates or opinions conforming to the requirements of the indenture, *but the trustee must examine them to determine whether they do conform.*"[71]

The Model Indenture[72] and the commentary thereon[73] contain similar language. So BT contends that the italicized language in the committee report, and the comparable language in the Model Indenture and commentary, demonstrate that the trustee's right to rely upon certificates or opinions, where an indenture so provided, was conditioned upon the trustee examining them for conformity with the requirements of the indenture.

■ The short answer is the well-settled principle that where a statute's language is unambiguous, the Court does not consider legislative history or other extraneous material.[74] And this statute *is* unambiguous. The "but" clause is set apart from (a)(1) and (a)(2) in a way that makes that clause grammatically and visually independent of (a)(1) and (a)(2). This formatting has been a feature of the statute since it was enacted.[75] Thus, the plain language and the structure of the statute require the trustee to examine evidence submitted to it for conformity with the indenture independent of whether it seeks to rely upon any statement or opinions set forth in that evidence.

Nor do the legislative history or the Model Indenture and its commentary conflict with the plain language of the original

---

**71.** H.R. REP. No. 76–1016, at 55 (1939), *reprinted in* 4 FEDERAL SECURITIES LAWS LEGISLATIVE HISTORY 1933–1982, at 3655, 3709 (1983) (emphasis added).

**72.** The Model Indenture provision is as follows:

"(a) Except during the continuance of an Event of Default,
(1) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and
(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the re-

quirements of this Indenture." ABF COMMENTARIES 248.

**73.** The commentary states:

"To be protected under th[e] provision [permitting the trustee to rely conclusively upon certificates or opinions which conform to the requirements of the indenture], the Trustee should first determine that the certificates or opinions furnished to the Trustee pursuant to specific requirements of the indenture conform to these requirements and are furnished by the person or persons specified in the indenture." *Id.* at 248–49.

**74.** *E.g., Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000); *United States v. Gonzales,* 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997).

**75.** *See* Trust Indenture Act of 1939, § 315(a), 53 Stat. at 1171; Trust Indenture Reform Act of 1990, Pub.L. No. 101–550, Title IV, § 414(2), 104 Stat. 2713, 2730 (1990).

version of the statute. None of it states affirmatively that the requirement that a trustee examine documents for conformity is a mere condition of the right to rely. It all uses language, if not always form, that makes the requirement independent of the right to rely. Furthermore, BT's citation of legislative history is selective. The House report includes as well, earlier in the document, a statement that clearly contemplates an independent duty to examine certificates for conformity:

> "Section 315(a) ... provides that, prior to default, the indenture trustee shall be liable only for the performance of the duties specifically set out in the indenture. But the indenture must require the trustee to examine the certificates or opinions furnished to it to determine whether or not they conform to the requirements of the indenture. This requirement was inserted in order to avoid the possibility that some trust institutions which adhere to the traditional mechanical view of their functions might fail to discover that the required evidence had not been furnished, or that the evidence furnished indicated a violation of the indenture." [76]

BT has offered no persuasive reason to read the statute as meaning anything other than what it says. Under Section 315(a) of the TIA, then, BT had a duty to examine all of the certificates submitted under Section 1017(a), (b), and (d) for compliance with all of the provisions of the indenture.[77] The Court assumes without deciding that this duty extended to verifying that certificates submitted in fulfillment of a TIA provision were signed by a person authorized under that provision, even where the indenture is silent on the issue.[78]

### 2. Did BT Breach the Duty?

There is no genuine dispute as to the facts material to this question.

The officers' certificates were nonconforming in that they lacked most or all of the Section 102 Language. BT argues that the officers' certificates were not required to contain the Section 102 Language, and in any event that the August 7, 1998 and November 26, 1998 statements contained all of the Section 102 Language. For reasons stated in the margin, both the first contention[79] and the second[80] lack merit.

---

**76.** H.R. REP. No. 76–1016, at 31, 4 FEDERAL SECURITIES LAWS LEGISLATIVE HISTORY 1933–1982, at 3685.

**77.** BT argues that § 603(a) of the indenture, which protected the trustee in relying on certificates it believed to be genuine and signed by the proper party, defines the extent of the § 315(a) duty to examine. This contention is easily disposed of. Section 603(a) governs when a trustee may rely on the truth of the matters asserted in the certificate, not the extent to which a trustee must ensure that the certificate says what the indenture requires it to say. BT argues further that § 107 of the indenture—which governs conflicts between the indenture and the TIA—allows § 603(a) to modify the § 315(a) duty. The argument fails. First, § 603 specifically makes the rights it confers "subject to" § 601, the provision that incorporates the TIA duties. Sec-

ond, the § 315(a) duty is simply not optional. Third, § 107 is a poorly drafted, confusing provision, and it is far from clear that it means what BT says it means.

**78.** It is not clear to what extent, if at all, the indenture incorporated the TIA. *See* Ind. § 107.

**79.** BT's argument appears to be that § 102, as relevant here, applies only to "certificate[s] or opinion[s] with respect to compliance with a condition or covenant provided for in this Indenture," and that the § 1017 officers' certificates are not evidence of compliance with a particular indenture covenant, but rather statements as to whether the signers have knowledge of defaults. BT argues also that the "informed opinion" contemplated by § 102 is inconsistent with the statement re-

On the other hand, the Court rejects the plaintiff's argument that certain certificates were not signed by a proper officer because they contained only Tam's and Holmes' signatures, but not Ting's.[81] Tam and Holmes are listed in Semi–Tech's 1998 incumbency certificate as "Executive Vice President" and "Executive Vice President, Secretary, and Director," respectively.[82] The plaintiff has conceded that Holmes was functioning as Semi–Tech's principal financial officer at the relevant time.[83] The plaintiff's position is that neither Tam nor Holmes was authorized at the relevant time to sign annual compliance certificates submitted in fulfillment of

garding the signer's "knowledge" contemplated by § 1017(a) and (b). These arguments are incoherent. As discussed above, a statement about defaults necessarily speaks to compliance. That § 1017 refers to knowledge rather than opinion likewise is irrelevant. BT seeks to draw support also from two other points: first, that TIA § 314(e), which imposes a § 102–like requirement on the certificates mandated by statute, does not apply to § 314(a)(4); and second, that the Model Indenture specifically exempts officers' certifications from the requirements of § 102. *See* ABF COMMENTARIES 325–26. Neither point helps BT. The indenture at issue here plainly imposes requirements beyond those of § 314(e) and the Model Indenture.

80. The statements, substantially reprinted in footnote 26 above, obviously lacked the language of § 102(2), which required "a brief statement as to the nature and scope of the examination or investigation" upon which the relevant statements were based. This requirement was distinct from that of § 102(3), which called for "a statement that ... [the signer] has made such examination or investigation as is necessary to enable it to express an informed opinion as to whether or not such covenant or condition has been complied with." The certificates in question (which should include the March 9, 1999 certificate because it contains nearly identical language) contain the § 102(3) statement, and they state that "due inquiry" was conducted, but they do not describe the nature and scope of the examination as required by § 102(2).

BT is simply wrong that a similar statement was found to comply with a § 102(2) equivalent in *Cruden v. Bank of New York,* 957 F.2d 961 (2d Cir.1992). The certificate at issue in *Cruden,* a legal opinion that a company's reorganization and entry into later indentures complied with an earlier indenture, stated in pertinent part: (A) "[W]e have examined the Agreement and Plan of Reorganization, the Indenture and the Supplemental Indenture, and ... such other documents, corporate records and certificates and such questions of law as we have considered necessary or appropriate."; and (B) "We are of the opinion that we have made such examination or investigation as is necessary to enable us to express an informed opinion as to the matters set forth below." *Id.* at 966, 970. Statement (A), though brief, fulfills § 102(2). The certificates at issue here contain no equivalent. The Court recognizes that the § 102(2) requirement is potentially vexing. Indeed, the Model Indenture deliberately removed officers' certifications from the requirements of the model § 102 because "[c]orporate trustees have experienced numerous difficulties in administering the requirements of [Section 102], particularly clause (2). Statements submitted by representatives of obligors are frequently vague as to the 'nature and scope' of the examinations made...." ABF COMMENTARIES 50–51, 325–26.

The parties to the indenture at issue here, however, did not follow the Model Indenture on this point. They drafted § 102 and § 1017 in such a way that § 102 applies to § 1017(a) and (b), and the difficulty of drafting § 102(2) language does not release the trustee from its obligation to insist upon that language.

81. The plaintiff has challenged the certificates dated June 3, 1998 and November 26, 1998. The August 7, 1998 certificate referencing § 314(a)(4), however, is identical to the November 26, 1998 certificate and signed by the same parties. *See* Def. Ex. 23.

82. Def. Ex. 24.

83. *See* Def. 56.1 St. ¶ 120 ("In or about September 1997, Mr. Holmes assumed the role of Semi–Tech's principal financial officer and signed Semi–Tech's financial statements."); Pl. 56.1 St. ¶ 120 ("Admitted"); *see also* Def. Ex. 91, 1998 report, at 24.

Section 314(a)(4) because that provision requires that such certificates be signed by "the principal executive officer, principal financial officer or principal accounting officer."

The Court disagrees. The statute enumerates job functions, not formal titles. There is no dispute that Holmes was functioning in one of the enumerated roles. Thus, BT did not breach any duty it may have had to challenge these certificates as not signed by a proper party under § 314(a)(4).

The plaintiff challenges also BT's failure to reject the accountant's certificates submitted from 1995 to 1998 as not containing the statement required by clauses (A) and (B) of Section 1017(d). The certificates in fact did not contain the relevant language. Indeed, in the September 18, 1998 letter, BT itself advised Holmes that D & T's 1998 certificate—which, as relevant here, was identical to the other accountant's certificates—"does not contain the statement required by Clauses (A) and (B) of Section 1017(d) of the Indenture." [84] The Court acknowledges that these certificates easily could have been interpreted to convey virtually the same information as the statements contemplated by Section 1017(d). Nevertheless the language was different, and the substance could be as well.[85]

In accordance with the preceding discussion, the Court concludes as a matter of law that BT breached its duty to examine the officers' and accountant's certificates it received pursuant to Section 1017(a) and Section 314(a)(4), Section 1017(b), and Section 1017(d) to ensure that those certificates conformed to the specific requirements of the indenture.[86] The only

---

**84.** Pl. Ex. 161.

**85.** Section 1017(d) required a statement that the accountants' "audit examination has included a review of the terms of [the] Indenture and the [Notes] as they relate to accounting matters," and stating "whether, in connection with their audit examination, any event which, with notice or the lapse of time or both, would constitute an Event of Default has come to their attention...."

The certificates actually received by BT stated: "We have reviewed Semi–Tech Corporation's compliance ... with items (1) through (4) and items (6) through (13) of Section 501 of [the indenture].... We understand that no notice was provided to the company with respect to items (6), (7) or (10) of Section 501.... Based on our review, nothing has come to our attention that causes us to believe that the company is not in compliance with items (1) through (4) and items (6) through (13) of Section 501 of the [indenture]."

It is true that the listed items cross-reference all of the significant accounting-related covenants in the indenture and there is no suggestion that any of the accountants at any point failed to discover a violation of an accounting-related covenant.

Strictly speaking, however, the language of the certificates does not conform to the indenture. The "items" cited in the certificates are not "terms" relating to accounting matters at all; rather, they are various definitions of "Event of Default." And arguably (though by no means certainly), the accountants could have understood the Company to have been "in compliance with" those "items," without regard to whether the Company was in compliance with the underlying covenants, so long as the Company had not yet received the notice necessary to convert a violation of a covenant into an Event of Default as defined in the relevant "item." Indeed, the accountant's certificates mention that the Company had not received such notice. Section 1017(d) does not call for such a statement; it would appear to be irrelevant in a conforming certificate.

In addition, the accountant's certificates received by BT do not state, as § 1017(d) requires, that the accountants reviewed the terms of the Notes. Finally, the certificates specifically state that they "do not express an audit opinion," whereas § 1017(d) may require an audit opinion.

**86.** The Court recognizes that strictly speaking, BT could have examined the certificates to determine whether they comply with the indenture but simply come to the wrong conclusion, namely that the certificates did com-

evidence called to the Court's attention that BT fulfilled any obligation to examine certificates for conformity to the indenture relates to the September 18, 1998 letter. Even in that instance, however, BT never received an amended certificate.[87]

*B. Section 315(b) Duty To Give Notice*

The plaintiff takes the position that Section 315(b)'s requirement that BT "give to the indenture security holders ... notice of all defaults known to the trustee," along with Section 602 of the indenture, obligated BT to notify the noteholders that it had received nonconforming documentation. BT responds that it did not know of those defaults and that even if it had known, it would have withheld notice pursuant to the statute's exception for good faith determinations that the withholding of notice is in the interests of the noteholders.

■ The section of the indenture on the trustee's due to notify, Section 602, states that "[f]or the purpose of this Section, the

term 'default' means any event which is, or after notice or lapse of time or both would become, an Event of Default." [88] And under the catch-all provision of the indenture section defining Event of Default,[89] a breach of any covenant not elsewhere dealt with in the definition of Event of Default— including covenants such as Section 102 or Section 1017(d) that govern the submission of documentation—could become an Event of Default if the Company receives a Notice of Default and 60 days pass without cure. In consequence, the term "default," for purposes of Section 315(b), includes the submission of nonconforming documentation.

■ Whether BT breached a duty in not notifying noteholders of those "defaults" is another matter. The statute by its terms applies only to defaults "known to the trustee." [90] BT—precisely because it breached its duties under Section 315(a)—did not know of the breaches of Section 102 and Section 1017(d).[91] The defendant argues

ply. The defendant has not made this distinction, and the Court sees no reason to do so, either. The Court understands § 315(a) to demand not just that the trustee "examine" the documents "to determine ... whether" they comply, but that the determination be correct.

**87.** The Court assumes without deciding that a failure to follow up on a notification of nonconformity is, for purposes of the duties at issue in this case, equivalent to a failure to examine a certificate for conformity in the first place. Alternatively, such a failure to follow up might be a breach of an indenture trustee's pre-default common law duties. *See* footnote 64 above.

**88.** *See also* ABF COMMENTARIES 253 (explaining the purpose of the last sentence in the Model § 602, which is identical to the last sentence in the present indenture's § 602, as follows: "Unlike other sections of the TIA which refer to the definition of 'default' as contained in the particular indenture (e.g., TIA §§ 315(a) and § 315(c)), TIA § 315(b) does not so refer.

Therefore, the word 'default' as used in that section of the statute has its ordinary meaning and is so defined in the last sentence of Section 602.").

**89.** Ind. § 501(10).

**90.** The indenture provision does not contain such an explicit limitation, but § 602 of the indenture references the statute ("The trustee shall give the Holders notice of any default hereunder as and to the extent provided by the [TIA]"), and the plaintiff has not argued that the duty to notify under § 602 is any broader than under the statute.

**91.** BT of course did know of the breach of § 1017(d) that occurred when it received D & T's nonconforming § 1017(d) certificate, because BT notified Semi–Tech of the discrepancy in the September 18, 1998 letter. The plaintiff, however, has not argued this point. Furthermore, there is no genuine factual dispute that "BT's corporate trust committee had determined that giving notice [to the security holders] of ... apparently non-

that BT cannot rely on its lack of knowledge because that lack of knowledge was the result of BT's own neglect of its Section 315(a) duties. But that is an argument explaining why BT should be liable for its breach of Section 315(a) for any damages that would have been prevented by any notice that BT would have given under Section 315(b) had it not breached Section 315(a). It is an argument, in other words, about causation with respect to the breach of the Section 315(a) duties, not a reason to impose liability for breach of Section 315(b).

The Court concludes as a matter of law that BT breached no duty to notify. The causation argument will be taken up below.

## C. Section 315(c) Duty of Prudence

■ The plaintiff argues that each submission of a non-conforming certificate was a "default" within the meaning of Section 315(c) and therefore triggered the trustee's heightened duty of care under that section. BT argues that "default" for purposes of Section 315(c) and (a) means "Event of Default," and that BT's duty of prudence was never triggered because no Event of Default occurred during its tenure as trustee.

Section 315(a) and (c), unlike Section 315(b), both refer to "default (as such term is defined in [the] indenture)." The indenture at issue here, like the Model Indenture, does not define "default" other than in Section 602.[92] The present indenture, however, does contain a comprehensive definition of "Event of Default." The plaintiff argues that the Section 602 definition should be used for purposes of Section 315(a) and (c). The Court rejects that position. The Section 602 definition is qualified explicitly as applying "[f]or the purpose of this Section,"[93] in other words for purposes of the duty to notify, not for purposes of determining whether the trustee is subject to Section 315(a) or Section 315(c) duties. The Court therefore must interpret "default" as used in Section 315(c) and applied to this indenture.

This is fundamentally a question of contract interpretation. The statute prescribes two different levels of duty and leaves it to the parties to define precisely when the trustee is subject to each. This the parties failed to clarify. It therefore must be determined what the parties intended, at the time they signed the indenture, with respect to the trigger for Section 315(c) duties.

conforming documents is not in the interests of security holders," Nasib Decl. ¶ 9. *See also* footnote 116 below. BT thus was protected in withholding notice under § 315(b). The plaintiff objects that a blanket policy rather than a specific decision by the corporate trust committee in every case does not meet the statute's requirement that the determination of the interests of the debt holders be made "in good faith." The objection is meritless. BT's policy and practice with respect to nonconforming documentation, as represented to the Court, fits squarely within the language of the proviso in § 315(b).

**92.** *See* ABF COMMENTARIES 39, 204–216. This omission was not as troublesome in the Model. The Model specifically provided that the

trustee was subject to the lower standard of care "[e]xcept during the continuance of an Event of Default" and that the trustee was subject to the higher standard of care if "an Event of Default has occurred and is continuing." *Id.* at 248–49. The Model, of course, was designed to comply with the earlier TIA, under which all duties derived from the indenture rather than the statute.

**93.** The plaintiff argues that the general statement in the dictionary section of the indenture that "[c]ertain terms, used principally in Article Six, are defined in that Article," Ind. § 101, at 3, means that the § 602 definition applies to the entire indenture. The argument fails. The § 602 definition, by its own terms, applies only to § 602.

This is a question of fact, but not one as to which there is a genuine dispute. The prospectus for the 1993 offering stated: "The Indenture provides that, except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it under the Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs." [94] Furthermore, Semi–Tech's counsel, in connection with the 1993 offering, assured BT that "the ... Indenture ... conform[s] in all material respects as to legal matters to the descriptions thereof in the Prospectus." [95] The plaintiff has offered no evidence that the parties intended anything other than that the trustee would be subject to the Section 315(c) duties only if an Event of Default had occurred and was continuing. [96]

Even if the question of how to define "default" in Section 315(a) and (c) were treated as one of statutory interpretation, the Court would reach the same conclusion. The plaintiff's interpretation would collapse any distinction between "default" as used in Section 315(b), on the one hand, and as used in Section 315(a) and (c) on the other. Its interpretation, therefore, would render superfluous the parenthetical in Section 315(a) and Section 315(c)—which has been part of the statute since 1939—and thus conflict with the rule against surplusage. [97]

In addition, the use of the word "default" in Section 315(a) and (c) is quite different from the use of the word in Section 315(b) and Section 602. Sections 315(a) and (c) use the singular and no article; they treat "default" as a state or condition in which the obligor either is or

94. Def. Ex. 87 at 45.

95. Def. Ex. 157 at 9. This statement was made in an opinion that Semi–Tech's counsel gave to the underwriter for the offering. Semi–Tech's counsel assured BT that it could rely on the opinion "as if [the] opinion had been addressed to you." *Id.* at 1.

96. The BT internal policy manual cited by the plaintiff, *see* Pl. Mem. 27 (citing Pl. Ex. 205), does not speak to the precise meaning of "default" and in any event has no bearing on what the parties intended in this case, or for that matter on what the statute requires.

Likewise, the plaintiff's argument that such an interpretation of "default" "would give BT too much control over the occurrence of an Event of Default," Pl. Mem. 27, does not speak to the intentions of the parties. In any event, the Court notes that the argument appears to be based on an incorrect reading of § 501(6) of the indenture, which defines as an Event of Default "the failure by the Company to comply for 30 days after notice with" certain covenants dealing with prohibited transactions. Unlike the catch-all definition of Event of Default (§ 501(10)), § 501(6) does not specify that the relevant notice must be a Notice of Default from BT or the noteholders to the Company. Thus, to use the plaintiff's example, if Semi–Tech had submitted an officers' certificate stating that it was in breach of the covenant against related-party transactions, then, as the Court understands the indenture, an Event of Default *would* have occurred if 30 days had passed without cure because the Company would have been on notice concerning the breach. A Notice of Default under the catch-all definition would not have been necessary to convert this "default" into an "Event of Default."

97. *See, e.g., TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citations omitted)).

is not.[98] By contrast, Section 315(b) and Section 602 treat a "default" as any of a set of discrete occurrences. The only concept in the present indenture that fits Section 315(a) and (c) is the "Event of Default," which, when it occurs and continues, works a definitive change in the rights and duties of the obligor and the noteholders. By contrast, the term "default," as used in Section 315(b) and Section 602, includes any violation, no matter how small or irrelevant to the parties' rights and obligations, and therefore ill accords with the apparent expectation of Section 315(a) and (c).

The Court concludes that "default," as used in Section 315(a) and (c) and as applied to this indenture, must mean the occurrence and continuance of an "Event of Default" under the indenture. It is conceded that no Event of Default under the indenture occurred while BT served as trustee. BT therefore had no duty to do the things that the plaintiff argues it should have done in the exercise of prudence, namely to inquire into the matters stated in the nonconforming documentation and give notices to the Company and to the noteholders that the Challenged Transactions violated the indenture.

The plaintiff places great weight on its argument that BT had no right under the statute and the indenture to rely on the truth of matters stated in nonconforming documentation. Whether or not that is true—an issue the Court does not now decide—it is beside the point for present purposes. Even if BT had no right to rely on the truth of matters stated in a particular certificate, it would not necessarily have had a duty to inquire into the matters stated by the certificate. Until the prudent person duties were triggered, the trustee's only obligations were to comply with the indenture (which imposed no duty to inquire) and to insist that all documentation conform to it.

## VI. Causation and Damages

Having identified BT's breaches, the next issue is the losses for which BT is liable.[99]

### A. The Causation Requirement

In *LNC Investments, Inc. v. First Fidelity Bank, N.A.,*[100] the Second Circuit, in a case that included claims of breach of fiduciary duty, breach of contract, and violation of the TIA, observed that a requirement of proximate causation applies to contract and tort causes of action and concluded that such a requirement applies as well where compensatory damages are sought for a breach of fiduciary duty under New York law.[101] Thus, an essential element of the plaintiff's case is that the complained-of breaches caused the losses in question.

Causation of course has two major components: cause-in-fact, or "but-for" cause, and proximate cause. Usually the first is given and the second is in issue. That is, in the usual case, it is undisputed that the complained-of loss would not have occurred had the defendant not committed the relevant breach. The only question is how far down the causal chain to go before

---

98. They say "prior to default . . ." and "in case of default . . . ," not, for example, "prior to *a* default" and "in case *a* default occurs."

99. The parties dispute vigorously precisely which claims the plaintiff validly holds and how to measure the damages to which the plaintiff is entitled. The Court does not reach these issues.

100. 173 F.3d 454, 464–66 (2d Cir.1999).

101. The opinion did not state explicitly that the same requirement applies to a TIA claim, but the Court regards such a view as implicit in the decision, which approved a jury instruction on causation in a case with both TIA and common law claims. *Id.* at 466.

cutting off liability. This is the proximate cause inquiry, and because it turns on such inherently factual questions as foreseeability, it usually is a question for the jury. Sometimes, however, what is at issue is but-for causation. This is such a case.

The plaintiff argues strenuously that the allegedly prohibited transactions and subsequent decline in the value of the Singer shares "was precisely the class of foreseeable risk that BT's obligations were intended to prevent." [102] But whether or not that is true, it is an argument only about proximate cause. It does not speak to whether causation-in-fact exists in this case. [103]

It is worth noting as well that this case is different from securities fraud cases brought under Section 10(b) of the Securities Exchange Act of 1934. [104] Liability in such cases requires both "transaction causation," which has been described as "the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities," [105] and "loss causation," which has been described as "the causal link between the alleged misconduct and

the economic harm ultimately suffered by the plaintiff," [106] or as a showing that "the economic harm that [the plaintiff] suffered *occurred as a result of* the alleged misrepresentations." [107]

Here, there is no allegation of fraud. The question here is not whether the plaintiff's members (or their assignors) bought Notes in reliance on any representation by BT or any other entity. BT's breaches of the duty to examine certificates were not representations to (or omissions to make representations to) the market at all. The concept of "transaction causation" is therefore inapplicable. [108]

"Loss causation," on the other hand, is illustrative. "Loss causation" in the Section 10(b) context often is compared to, or said to embody notions of, the traditional tort law concept of proximate cause. [109] But a causal connection "between the alleged misconduct and the economic harm" or a showing that harm "occurred as a result of" a misrepresentation also must include a but-for component (apart from the plaintiff's decision to enter into the transaction), [110] even if that component is

**102.** Pl. Mem. 30.

**103.** Likewise, the jury instruction approved in *LNC Invs. v. First Fidelity Bank, N.A., see* 173 F.3d at 466 n. 10, addressed only proximate cause.

**104.** 15 U.S.C. § 78j(b).

**105.** *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196–97 (2d Cir.2003).

**106.** *Id.; accord Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005).

**107.** *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992) (emphasis in original).

**108.** *Cf. First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,* 218 F.Supp.2d 369, 383 n. 44 (S.D.N.Y.2002) (finding concept of "trans-

action causation" inapplicable in fraud case that did not involve alleged misrepresentations for the purpose of luring plaintiffs into injurious transactions), *aff'd,* 385 F.3d 159 (2d Cir.2004).

**109.** *E.g., Emergent Capital Inv. Mgmt.,* 343 F.3d at 197; *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001); *Citibank,* 968 F.2d at 1495; *cf. Lentell,* 396 F.3d at 172–73 (acknowledging that "the tort analogy is imperfect" because of the peculiarities of the securities fraud context, in which the drop in value of a security cannot be said to be caused by misstatements or omissions but rather by the underlying circumstance that is concealed).

**110.** *See Moore v. PaineWebber, Inc.,* 189 F.3d 165, 175 (2d Cir.1999) (Calabresi, J., concurring) (The "loss causation" requirement "is, in fact, not significantly different from the standard tort law requirement that a defen-

not at issue in the usual run of cases. The Circuit has recognized this point in RICO actions based on fraud—where there is also a dual requirement of "transaction causation" and "loss causation" [111]—by explaining that the "loss causation" requirement means that "the misrepresentation must be *both an actual and* a proximate source of the loss that the plaintiffs suffered." [112] So the jurisprudence on loss causation, *though not controlling here*, supports the conclusion that the threshold question in this case is whether the breaches by BT were causes in fact of the losses complained of by plaintiff.

## B. Evidence of Causation

The defendant argues that there is insufficient evidence of causation, an issue on which the plaintiff would have the burden of proof at trial. In such a case, "the burden shifts to the non-movant to present 'persuasive evidence that its claim of causation [is] not implausible.'" [113] The plaintiff therefore had the burden to come forward with evidence of actual causation and not just conjecture. If the plaintiff has failed to meet this burden, the Court must dismiss its claims as a matter of law.[114]

The plaintiff is not claiming that, had BT insisted that the officers' certificates include the Section 102 Language, the signers of the certificates or Semi–Tech generally would have learned of indenture violations (Section 102, after all, requires some kind of investigation) that then would have been remedied or mentioned in the certificate. Nor does the plaintiff contend that the accountants would have concluded that indenture violations had occurred if BT had insisted on the Section 1017(d) language in the accountant's certificates. Rather, considered liberally, the plaintiff's submissions can be seen as putting forth three other theories of causal connection between the noteholders' losses and BT's breach of Section 315(a). The Court will examine the sufficiency of the evidence supporting but-for causation as to each of them.

### 1. The First Theory of Causation: BT's Breaches Caused BT Not To Give the Noteholders Notice of the Nonconformities

 The plaintiff's argument that BT is liable for the failure to give the noteholders notice of the non-conformities un-

---

dant's acts cause not only an accident but also the injury to the plaintiff that followed from the accident."); *see also Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–85 (7th Cir.1990) (Posner, J.) ("Indeed what securities lawyers call 'loss causation' ... is an instance of the common law's universal requirement that the tort plaintiff prove causation.... 'Loss causation' *is* an exotic name ... for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains."); *Ambassador Hotel Co. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1029 (9th Cir.1999) ("[A] wrong cannot be the proximate cause of harm if it was not an actual cause of that harm.").

**111.** *E.g., Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir.1995).

**112.** *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 255 (2d Cir.2004) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999)), *petition for cert. filed*, 73 U.S.L.W. 3216 (U.S. Sept. 28, 2004) (No. 04–433) (emphasis added).

**113.** *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, No. 92 Civ. 7584 MBM, 1997 WL 528283, at *28 (S.D.N.Y. Aug.27, 1997) (citing *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 865 F.2d 492, 493 (2d Cir. 1989) (internal quotation marks omitted)).

**114.** *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 865 F.2d 492, 493 (2d Cir.1989); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41–42 (2d Cir.1986) (affirming grant of summary judgment on grounds of insufficient evidence of causation in fact).

der Section 315(b) is in substance a contention that BT's breaches of Section 315(a) render it liable for any damages that would have been prevented had BT given Section 315(b) notice after discovering the nonconformities. The plaintiff argues that "a reasonable jury could find that ... if BT had provided notices of default to the Noteholders, the Noteholders would have taken legal action to protect their interests" from any harm due to the Challenged Transactions.[115]

The plaintiff has not raised a genuine issue of fact as to this theory. Whether or not the plaintiff is right that a reasonable jury could find that notice from BT that certain certificates lacked the Section 102 Language would have induced the noteholders to take legal action regarding the Challenged Transactions (the Court expresses no opinion on the question), no reasonable jury could find something else that the argument assumes here, which is that BT would have given that notice in the first place. Not only is this sheer speculation, but it is refuted by undisputed evidence.

There is no genuine dispute that BT's practice, when it became aware of nonconforming documentation, was not to give security holders notice (which after all could disrupt the bond markets) but to contact the company to request conforming documentation.[116] Indeed, this practice does not appear to be unique to BT. The plaintiff's own expert witness, a leading authority on corporate trust administration,[117] testified that he could not recall a single instance in which an indenture trustee, after receiving nonconforming documentation, gave notice to the debt holders.[118]

The plaintiff has not cited a single piece of evidence tending to show that BT, had it not breached Section 315(a), would have done anything other than request conforming documentation. The plaintiff's assertion that "[a]lthough BT claims that it had a policy (unwritten) to withhold notice of all non-conforming documentation, that policy is not stated in any of BT's policy manuals"[119] is misleading. Buried within the heaps of irrelevant internal policy documents from BT with which the plaintiff has unjustifiably burdened the Court are the statements cited in support of the first sentence of the previous paragraph tending to show that BT's prescribed procedure for dealing with nonconforming documentation was to request a correction.

## 2. The Second Theory of Causation: BT's Breaches Caused BT To Overlook the Challenged Transactions

The plaintiff next argues that "BT well may have uncovered serious problems at

---

115. *Id.* at 32.

116. *See* Nasib Decl. ¶¶ 2, 8–9; Pl. Ex. 206 at BTCO 43140 (manual titled "Corporate Trust and Agency Services New York Administration Procedures and Guidelines" and dated September 1997, instructing that if a document is not "acceptable," "write to appropriate party requesting correction"); Pl. Ex. 203 at BTCO 45432 (manual with same title but no date, stating that if a document "does not conform to the requirements, then the Reviewer drafts a letter to the sender requesting an updated version"); Pl. Ex. 209 at 1–2 (March 1999 policy statement requiring account administrators who receive noncon-

forming documents first to request corrected documents, then to allow 90 days to pass, and only then to report the failure to an internal committee, which is "to consider the appropriate action[,] which may include ... notification to bondholders.").

Nor is there any reason to believe that this practice was a violation of § 315(b). *See* footnote 91 above.

117. *See generally* LANDAU & KRUEGER; Landau Report ¶¶ 1–2.

118. Landau Dep. 286.

119. Pl. 56.1 St. ¶ 367; *accord* Pl. Mem. 24.

Semi–Tech" if it had examined the nonconforming certificates and sought conforming ones, and that the result might have been an Event of Default and therefore protection for the noteholders.[120]

This theory suffers from the same deficiency as the first. There is no evidence that BT had a practice of investigating the matters stated in the certificates. Indeed, the statute and indenture specifically provide that BT had no duty to inquire into such matters. BT's sole duty was to insist on conforming documentation. Had BT so insisted, there is no reason to believe that BT would have learned of any information beyond what it already knew.[121]

### 3. The Third Theory of Causation: BT's Breaches Affected the Behavior of Semi–Tech's Officers

The core of the plaintiff's causation argument, at least as applied to the Section 315(a) breaches, is really the assertion that "if BT had not been negligent throughout the term of the indenture, BT would have caused Semi–Tech's directors and officers to be more observant of the Indenture's covenants; as a result, the [Challenged Transactions] would not have occurred." [122] This appears to be an argument about atmosphere or culture. The plaintiff in effect argues that if BT had done everything by the book, it would have prevented the creation of a climate in which Semi–Tech's management felt free to engage in transactions that violated the indenture and ultimately caused the noteholders' losses.

From a factual record on this motion that includes twenty-one bound volumes of exhibits and stands nearly three and one-half feet tall, the plaintiff has produced not a shred of evidence to support this theory. Nor, contrary to its argument, is the plaintiff entitled to have a jury fill that gap by speculating as to how Semi–Tech might have behaved if BT had acted differently. A reasonable jury by definition makes decisions based on evidence before it, and the plaintiff has offered none that would tend to substantiate its theory.[123]

This case, then, falls squarely within *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*[124] In that case the defendant, acting as a futures commission merchant, was found to have breached a duty that it owed to the plaintiff when, without conducting any inquiry, it erroneously certified to the New York Mercantile Exchange that a seller owned

120. Pl. Mem. 33.

121. The plaintiff's argument that Semi–Tech might have refused to comply with requests to add the Section 102 Language to the certificates is speculative and unsupported by evidence and therefore merits no consideration.

122. Pl. Mem. 32.

123. *See* Pl. 56.1 St. ¶¶ 195, 197 (asserting, without citations to the record and therefore in violation of Local Rule 56.1, that "BT's inattentiveness to the interests of the Noteholders permitted Semi–Tech to act with impunity" and that "[h]ad Bankers Trust acted competently, the directors and officers of Semi–Tech could not have, or would not have, dissipated Semi–Tech's assets").

The plaintiff does point out that some members of Congress believed that requiring language similar to the Section 102 Language would "make clear that the execution of a certificate or opinion is not to be considered a mere matter of routine, and will go far to discourage a casual disregard of the covenants and conditions prescribed in the indenture...." H.R. Rep No. 76–1016, at 32 (1939), *reprinted in* 4 Securities Laws Legislative History 1933–1982, at 3655, 3686 (1983). That might be a reason to find proximate cause if there were evidence of but-for cause, but it is not itself evidence of but-for cause.

124. 865 F.2d 492 (2d Cir.1989).

and had possession of 87,000 barrels of oil that the plaintiff contracted to buy.[125] There was no evidence, however, that the plaintiff believed the seller had the oil or otherwise relied on the defendant's certification in entering into the transaction.[126] In other words, there was no evidence of but-for causation. The Second Circuit agreed with the district court that "no reasonable jury could find a causal connection between [the defendant's] failure to inquire of [the seller] and [the plaintiff's] loss." [127]

So too here. The plaintiff has failed to meet its burden with respect to evidence of causation.

### VII. Nominal Damages

 Under New York law, "[n]ominal damages are always available in breach of contract actions." [128] Because the Court concludes as a matter of law that BT breached its duty to examine certificates, a duty incorporated by reference into a contract to which it was a party, BT is liable for nominal damages.

### VIII. Conclusion

The Court has reviewed the letter from defendant's counsel requesting permission to supplement its submissions, as well as the exchange of letters that followed. The Court finds that the correspondence raises no material issues not dealt with in this opinion and accordingly denies permission to supplement.

The defendant's motion for summary judgment dismissing the complaint [docket item 181] is granted to the extent that the plaintiff asserts claims for relief based on violation of the TIA and breach of fiduciary duty. The motion is otherwise denied. Judgment is granted for the plaintiff in the amount of $1. The Clerk shall enter final judgment accordingly and close the case.

SO ORDERED.

---

**125.** The alleged facts are set forth fully in an earlier opinion, *see* 748 F.2d 774, 778 (2d Cir.1984).

**126.** 684 F.Supp. 27, 35 (S.D.N.Y.1988).

**127.** 865 F.2d at 493 (quoting 684 F.Supp. at 35).

**128.** *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993); *accord Ely–Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 503, 615 N.E.2d 985 (1993).